**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| C.S. LAWN & LANDSCAPE, INC.<br><br>    1107 Butterworth Court<br>    Stevensville, MD 21666<br><br>            Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF LABOR,<br><br>    200 Constitution Ave NW<br>    Washington, DC 20210<br><br>and JULIE A. SU, in her official capacity as<br>Acting United States Secretary of Labor,<br><br>    200 Constitution Ave NW<br>    Washington, DC 20210<br><br>            Defendants. | Civil Case No. _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**AND DEMAND FOR JURY TRIAL**

**INTRODUCTION**

1.      C.S. Lawn and Landscape, Inc. (CS Lawn)—a small landscaping business in Maryland founded by its sole owner Charles Saine—spent the last seven years defending itself against investigations and enforcement proceedings within the U.S. Department of Labor (DOL).

2.      CS Lawn participated in DOL's H-2B visa program for temporary workers without incident for close to two decades. But DOL's in-house prosecutors charged CS Lawn with violating the program's regulations from 2013 to 2015 by, for example, allegedly violating a local zoning ordinance. After a three-day hearing before a DOL in-house judge, and later an

1

appeal to a DOL in-house appellate panel, CS Lawn was ordered to pay more than $43,000 for the technical zoning offense and around $10,000 for similarly minor violations.

3.      CS Lawn never had the opportunity to make its case before a judge who was not employed by DOL, and all the fact-finding was performed by agency employees, not by a Seventh Amendment jury. A judge and jury should have determined whether temporary workers suffered any harm as a result of CS Lawn's alleged zoning violation—renting an apartment (with a full bathroom, kitchen, washer and dryer, and living space) for $200 per month per person to temporary workers (who chose to live there multiple years in a row) when the apartment was in a non-residential zone district (where migrant labor camps are a permitted use)—and, if so, what proportional relief would be. DOL agreed the zoning violation did not harm the workers, but its in-house agency judges imposed tens of thousands of dollars of liability anyway.

4.      Not only did DOL appoint itself investigator, prosecutor, judge, and jury in this case, it also prosecuted CS Lawn under regulations that DOL did not have authority to issue. Congress assigned rulemaking authority for the H-2B program to the Department of Homeland Security, not DOL. But DOL promulgated regulations regardless, and then DOL's agency judges decided (over CS Lawn's objections) that DOL could investigate, prosecute, and collect against CS Lawn under those regulations.

5.      In other words, DOL enacted its regulations without authority; decided it could enforce those regulations against CS Lawn; and then found the facts, applied the regulations to these facts, and decided the penalty, all without an independent judge or a jury.

6.      This Complaint raises claims under the U.S. Constitution's Article III and the Seventh Amendment. If an agency wants to impose financial liability for back wages and civil penalties—remedies that historically were pursued in civil actions in the common law courts—

2

then the agency must proceed before a real federal judge in a real federal court where the right to trial by jury can be preserved.

7.     The Complaint raises other claims as well. The imposition of tens of thousands of dollars in liability for a zoning violation violates the Excessive Fines Clause. Indeed, even under the Administrative Procedure Act's deferential standard of review, DOL's award is unsupported by substantial evidence, an abuse of discretion, and not in accordance with law. Nearly eight years after this administrative odyssey began, DOL's unconstitutional award should be set aside.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 2201, 2202 and 5 U.S.C. § 702.

9.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(e). The U.S. Department of Labor is an agency of the United States and is located at 200 Constitution Ave. NW, Washington, DC 20210, which is within the vicinage of the United States District Court for the District of Columbia.

## THE PARTIES

10.     Plaintiff C.S. Lawn and Landscape, Inc. ("CS Lawn"), is a corporation organized under the laws of Maryland. Its founder, Charles Saine, is also CS Lawn's sole shareholder. Mr. Saine owns and operates the business, which specializes in landscape and hardscape design, installation, and maintenance for both residential and commercial clients in and around the Annapolis and Kent Island areas.

11.     Defendant U.S. Department of Labor ("DOL") is a federal administrative agency responsible for bringing enforcement actions against employers for alleged violations of the H-2B program's rules and regulations. That authority was delegated to DOL by the Department of

Homeland Security ("DHS"). The enforcement proceeding at issue in this case was based on regulations DOL promulgated and was initiated by DOL personnel, tried by DOL attorneys, heard and decided by a DOL administrative law judge, and then affirmed by a panel of DOL appellate judges.

12.     Defendant Julie Su is sued in her official capacity as the acting U.S. Secretary of Labor. In that capacity, she is responsible for the oversight, administration, and enforcement of the H-2B visa program.

## REGULATORY BACKGROUND

### The Statutory Framework

13.     The H-2B visa program was created by Congress in 1986, as part of the Immigration Reform and Control Act, Pub. L. No. 99-603, 100 Stat. 3359. The H-2B program allows for employment of foreign nationals as temporary non-agricultural workers in circumstances where an employer's needs cannot be met out of the domestic labor pool. *See* 8 U.S.C. §§ 1101(a)(15)(H)(ii)(b); 1184.

14.     DHS and DOL jointly administer the H-2B program. For example, to participate in the H-2B program in a given year, an employer must file paperwork with both agencies months in advance.

15.     The paperwork includes information about the employer's anticipated need for temporary workers, as well as information about the job itself and about related items like payroll deductions, whether the employer is furnishing meals or lodging, and so on.

16.     Congress directed DHS (not DOL) to enforce H-2B regulations against employers if DHS "finds, after notice and an opportunity for a hearing," that a violation occurred, but, in 2008, DHS delegated that enforcement authority to DOL. *See* 8 U.S.C. §§ 1184(c)(14)(A), (B);

4

*see* 73 Fed. Reg. 78,020 (Dec. 19, 2008) ("Although Congress has conferred the statutory

authority to enforce H–2B program requirements on the Department of Homeland Security

(DHS), recent discussions between DHS and the Department have yielded an agreement for the

delegation of H-2B enforcement authority from DHS to the Department."); *id.* ("effective

January 18, 2009").

17.     Congress also directed DHS (not DOL) to promulgate regulations to govern the

H-2B program. *See* 8 U.S.C. § 1103(a). Nonetheless, in 2008, at the same time that DOL began

enforcing compliance with H-2B regulations, DOL promulgated substantive regulations to

govern the conduct of employers participating in the H-2B visa program. 73 Fed. Reg. at 78,020

(codified at 20 C.F.R. §§ 655-56 (2008)).

18.     In February 2012, DOL again promulgated regulations to govern the conduct of

employers participating in the H-2B visa program. 77 Fed. Reg. 10,038 (Feb. 21, 2012). Those

regulations were challenged in federal court in April 2012 and ultimately were enjoined before

ever taking effect on the ground that Congress did not delegate (or authorize DHS to delegate)

rulemaking authority to DOL. *Bayou Lawn & Landscape Servs. v. Solis*, Case No. 3:12-cv-

00183-MCR-CJK, ECF 24 (N.D. Fla. Apr. 26, 2012).

19.     As a result of the 2012 regulations being enjoined, the 2008 regulations remained

in effect until they also were enjoined for the same reason. *Perez v. Perez*, Case No. 3:14-cv-

00682-MCR-EMT, ECF 14 (N.D. Fla. Mar. 4, 2015).

20.     In 2015, DOL and DHS acted to replace the invalid 2008 and 2012 regulations

with new regulations that were jointly issued by the two agencies. *See* 80 Fed. Reg. 24,042 (Apr.

29, 2015) ("Interim final rule" replacing, for example, provisions regarding deductions—e.g., 20

C.F.R. § 655.22(g)(1) (2008), replaced by 29 C.F.R. Part 531, 20 C.F.R. § 655.20(c)—or

enforcement—e.g., 20 C.F.R. §§ 655.23 (debarment) and 655.65 (civil monetary penalties and other remedies like back wages) (2008) with 29 C.F.R. §§ 503.23-24 (debarment and civil monetary penalties) and 503.20 (back wages)).

21.     The federal court that had enjoined DOL's 2008 regulations later issued a one-line order to "clarif[y]" that its injunction "was not intended to, and does not, apply retroactively." *Perez*, Case No. 3:14-cv-00682-MCR-EMT, ECF 62 (N.D. Fla. Sept. 4, 2015).

22.     DOL subsequently decided that even though the 2008 regulations were promulgated without any legal authority, the 2008 regulations would apply to any H-2B employer's paperwork submitted before April 29, 2015, while the 2015 regulations would apply to any such paperwork submitted after that date.

### DOL's System of Administrative Adjudication

23.     The Secretary of Labor promulgated regulations allowing DOL to impose remedies of debarment, civil monetary penalties, and back wages for violations of H-2B program regulations in its own in-house administrative courts, before its own in-house agency judges. 20 C.F.R. §§ 655.23, 655.65 (2008); 29 C.F.R. §§ 503.23, 503.24, 503.26.

24.     Under these regulations, in order to impose liability, DOL's in-house judges must find that there was a "substantial failure" by the employer "to meet" the "terms and conditions" in the H-2B program paperwork, or that the paperwork contained a "[w]illful misrepresentation of a material fact," in order to impose liability. 29 C.F.R. § 503.19(a)(1)-(3); *see also* 20 C.F.R. §§ 655.60, 655.65 (2008).

25.     A "substantial failure" is a "willful failure to comply that constitutes a significant deviation from the terms and conditions" in the H-2B paperwork. 29 C.F.R. § 503.19(a)(2); *see also* 20 C.F.R. §§ 655.60, 655.65 (2008).

26.     Whether a violation is a "significant deviation" depends on a list of non-exhaustive "factors that [DOL] may consider." 29 C.F.R. § 503.19(c); *id.* § 503.19(c)(1)-(5) (listing factors); *see also* 20 C.F.R. §§ 655.60, 655.65 (2008).

27.     The amount of back wages or penalties is determined in the first instance by the agency's enforcement personnel in the Wage and Hour Division. 29 C.F.R. § 503.20; *id.* § 503.41; *see also* 20 C.F.R. § 655.65(i) (2008).

28.     As to civil penalties, DOL may set them at "the difference between the amount that should have been paid," the wages that "would have been earned," or an amount of DOL's choosing based on non-dispositive factors, but the penalties may not exceed $14,960 per violation. 29 C.F.R. § 503.23(b)-(e); *see also* 20 C.F.R. § 655.65 (2008).

29.     Under DOL's regulation, "[e]ach . . . failure to pay an individual worker properly or to honor the terms or conditions of a worker's employment . . . constitutes a separate violation." 29 C.F.R. § 503.23(a).

30.     Once a penalty is assessed by DOL's enforcement personnel, that determination is reviewed at a hearing by DOL Administrative Law Judges ("ALJs"), who are employees of the agency. *See generally* 29 C.F.R. §§ 503.48-.50.

31.     As DOL employees, ALJs are affected by the financial health of the agency as a whole. For instance, when DOL was forced to make budget cuts in 2013, the DOL's Office of Administrative Law Judges was forced to cut its budget by five percent and, as a result, furloughed DOL ALJs for multiple days.

32.     ALJs enjoy some statutory protection against removal and can only be removed upon a finding of "good cause" by the Merit Systems Protection Board. 5 U.S.C. § 7521(a), (b).

Meanwhile, members of the Merit Systems Protection Board may themselves only be removed for "inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d).

33.     At the same time, ALJs do not enjoy the far greater protection against removal that the Constitution provides for Article III judges.

34.     A certain degree of agency influence is, in fact, part of an agency judge's job description, as "[i]t is the ALJ's *duty* to decide all cases in accordance with agency policy." Morell E. Mullins, *Manual for Administrative Law Judges*, 23 J. Nat'l Ass'n Admin. L. Judges 136-37 (2004) (emphasis added). The Solicitor General has suggested that failure "to follow agency policies" constitutes good cause for removal of an ALJ. *See* Office of the Solicitor General, *Guidance on Administrative Law Judges* 9 (2018), https://perma.cc/SF66-UFGP.

35.     After an ALJ issues a decision, DOL regulations allow an employer to appeal that decision to an internal agency appellate court called the Administrative Review Board ("ARB"). 29 C.F.R. §§ 503.51-.55.

36.     The ARB is nowhere authorized by any statute. Rather, the Secretary of Labor created the ARB by executive order in 1996. *See* Secretary's Order 02-96, 61 Fed. Reg. 19,978 (May 3, 1996); *see also* Secretary's Order 02-2012, 77 Fed. Reg. 69,378 (Nov. 16, 2012).

37.     The ARB consists of a maximum of five agency judges appointed by the Secretary of Labor. 77 Fed. Reg. at 69,379. The members of the ARB are appointed for a fixed term "of two years or less." *Id.*

38.     The Secretary of Labor's Orders creating the ARB direct that "[t]he Board shall not have jurisdiction to pass on the validity of any portion of the Code of Federal Regulations which has been duly promulgated by the Department of Labor and shall observe the provisions

thereof, where pertinent, in its decisions." 61 Fed. Reg. at 19,979; *see also* 77 Fed. Reg. at 69,379.

## DOL's H-2B Enforcement Activity

39.     In recent years, the volume of enforcement activity under the H-2B program has significantly increased. From 2011, the first year for which DOL makes data available, to 2018, annual civil monetary penalties imposed by DOL for violations of the H-2B program averaged $335,802.33. From 2019 to 2022, that annual average was $1,737,054.42.[1]

40.     From 2011 through April 2023, for alleged violations of the H-2B program, DOL has imposed more than $200,000 in civil monetary penalties against an employer on two occasions; between $100,000 and $200,000 on 14 occasions; between $10,000 and $100,000 on 365 occasions; and under $10,000 on 279 occasions. *See* U.S. Dep't of Labor, Wage and Hour Compliance Action Data (hereinafter, "DOL Data").[2]

41.     In addition to imposing civil monetary penalties for H-2B violations, DOL's ALJs also assess back wages that are purportedly owed to employees of H-2B employers. From 2011 through 2018, DOL ordered H-2B employers to pay an average of $399,304.28 in back wages each year. From 2019 through 2022, that annual average was $1,645,992.64.[3]

42.     From 2011 through 2022, DOL assessed a total of $9,634,636.29 in civil monetary penalties and $9,778,404.80 in back wages in connection with the H-2B program.[4]

---

[1] *Available at* https://www.dol.gov/agencies/whd/data/charts/industries-h2b-workers (XLS, "H2B Violations Only", "FY2011", "CMP Assessed").

[2] *Available at* https://enforcedata.dol.gov/views/data_summary.php.

[3] *See supra* n.1.

[4] *Id.*

43.     Back wages are technically owed to the employees, but in many cases involving the H-2B program they are collected by the agency. Employees must then claim the funds from the government. If the funds go unclaimed for three years, the government keeps the money.

44.     In 2015, the DOL's Office of Inspector General found that DOL "made minimal efforts to locate" employees who it was supposed to pay back wages. U.S. Dep't of Labor, Office of Inspector General, *Wage and Hour Division Needs to Strengthen Management Controls for Back Wage Distributions* (Mar. 2015).[5] As a result, between 2010 and 2014, the government kept $60 million in back wages that were collected by DOL and never paid to workers. *Id.*

## FACTUAL BACKGROUND

## C.S. Lawn and Landscape, Inc.

45.     CS Lawn is a small landscaping business that specializes in landscape and hardscape design, installation, and maintenance for residential and commercial clients in the area of Annapolis and Kent Island, Maryland.

46.     Charles Saine is the sole owner of CS Lawn, and he manages the business's day-to-day operations. He founded the company himself about 40 years ago. He is now on the cusp of retirement.

47.     Landscaping and hardscaping involve difficult manual labor. Employees must often carry or haul equipment (e.g., lawn mowers, leaf blowers, rakes), supplies (e.g., mulch, sod), plants, and other items. They also often work, while kneeling or on hands and knees, to install and arrange landscaping and hardscaping materials.

48.     CS Lawn depends on seasonal labor to service its clients, and it would be impossible to run the business without those workers. By 2015, with the help of a third-party

---

[5] *Available at* https://www.oig.dol.gov/public/reports/oa/2015/04-15-001-04-420.pdf.

contractor CS Lawn hired to help with compliance, CS Lawn had been participating in the H-2B program each year for two decades without incident.

49.     During the times relevant to this case, CS Lawn's seasonal workers were paid above minimum wage: From 2013 to 2015, when the events at issue here occurred, CS Lawn paid its workers more than $9.79 per hour, well above the then-prevailing state minimum wage of $7.25 per hour (in 2013), $8.00 per hour (as of January 1, 2015), and $8.25 per hour (as of July 1, 2015). Moreover, unlike for domestic workers, those wages are not subject to tax withholding.

50.     Temporary workers at CS Lawn were free to live where they chose, and CS Lawn was not obligated to offer lodging, but CS Lawn did rent conveniently located apartments to some of the workers. For example, CS Lawn rented one unit to five or six workers each year at $200 per person per month. At least two of the workers lived there all three years at issue here (2013-15), and one lived there two years in a row.

51.     Working in landscaping and hardscaping is hard work, and doing that for CS Lawn was no exception. But it is also comparatively well-paid work. Given the wage rate, and the availability of convenient and affordable lodging, workers can make a good amount of money over a season, which is evidenced by the many temporary workers who returned in multiple years to work for CS Lawn via the H-2B program.

**DOL's Investigation and Assessment**

52.     Early in 2015, a DOL inspector began investigating CS Lawn based on a complaint that workers there were being underpaid.

53.     DOL's investigation focused on alleged violations of the regulations promulgated by DOL in 2008 to govern the H-2B program. As a result, the investigation was paused when a

federal judge enjoined DOL from enforcing those regulations on the ground that DOL did not have any authority to promulgate those rules. *See supra* ¶¶ 18-19.

54.     The investigation started back up in November 2015, after the same federal court "clarified" that its injunction was not intended to apply retroactively. *See supra* ¶ 21.

55.     The DOL inspector gathered documents and records, interviewed witnesses, contacted third parties, conducted site visits, and engaged in additional informal discovery via communications with CS Lawn and its retained counsel.

56.     The investigation continued for more than two years before concluding in February 2018, when DOL sent CS Lawn a determination letter ordering CS Lawn to pay over $220,000 in back wages and civil penalties. A copy of that letter is attached as Exhibit A.

57.     The letter stated that, if CS Lawn wanted to contest the assessment, it was required to do so in DOL's in-house agency courts. The letter warned that "[i]f C.S. Lawn & Landscape, Inc. does not make a timely request for a hearing, this determination letter will become a final order of the Secretary of Labor and may no longer be appealed."

## AGENCY PROCEEDINGS

### Before the Administrative Law Judge

58.     As required by DOL regulations, CS Lawn requested a hearing to contest the agency's assessment of penalties and back wages, and to preserve its right to further appeals.

59.     The Administrator of DOL's Wage and Standards Division referred the case to the DOL's Chief ALJ, who, in turn, referred the case to DOL ALJ Morris D. Davis.

60.     ALJ Davis held a three-day hearing for this case in November 2018. The hearing involved telephonic and live testimony from multiple witnesses, including Charles Saine, two CS

Lawn employees, four former temporary workers for CS Lawn, and the DOL inspector who

investigated CS Lawn from 2015 to 2018 and issued DOL's determination letter.

61.     The ALJ's September 6, 2019, decision affirmed DOL enforcement personnel's

conclusion that CS Lawn violated the county zoning code from 2013 to 2015 and made improper

uniform deductions in 2015; affirmed two other minor violations; and assessed back wages and

civil monetary penalties for each. A copy of the ALJ's decision is attached as Exhibit B.

62.     While the ALJ did not impose the full amount of liability threatened in DOL's

initial assessment letter, the ALJ nonetheless imposed significant liability totaling $57,000—

$36,000 in back wages and $21,000 in civil monetary penalties. The basis for the ALJ's award is

set forth in more detail below.

The County Zoning Code Violation

63.     From 2013 to 2015, five or six temporary workers rented a converted apartment

from CS Lawn.

64.     The apartment was above CS Lawn's office, which was also conveniently located

near grocery stores and other local businesses the workers might need to frequent. It had two

small bedrooms, a living space, a full kitchen, washer and dryer, and a full bathroom. Each

worker paid $200 per month in rent to stay there.

65.     The apartment was located in the county's Suburban-Industrial District, which

allows for migrant labor camps but is not otherwise zoned for residential use.

66.     Neither DOL nor the ALJ considered the apartment unsafe or dangerous. Neither

concluded the workers were overcharged or harmed by the $200 per month rent.

67.     DOL's sole theory was that "C.S. Lawn & Landscape, Inc. or its agents/attorneys

made impermissible deductions from the employees for . . . housing" because the property was

not in a residential zone, which meant the rent deductions were not "authorized" under DOL's (by-then enjoined and removed) regulations.

68.     The ALJ concluded that CS Lawn's paperwork for the H-2B program stated that housing would "meet all applicable state and local codes for rental property," thus transforming the technical violation of the county zoning code into a violation of the federal H-2B program.

69.     The assessment was not related in any way to any allegation that temporary workers were harmed by the deductions or by living in the apartment.

70.     On the basis of that technical zoning violation, which was never shown to harm a single worker, the ALJ ordered CS Lawn to pay $43,500—back wages equal to the full amount of the rent paid by the workers for the apartment ($36,000 total) plus a $2,500 penalty for each year the violations occurred ($7,500 total).

<u>The Uniform Deductions</u>

71.     Prior to 2015, CS Lawn provided uniforms to employees, and the employees were required to launder the uniforms themselves.

72.     When it applied to participate in the program in 2015, CS Lawn decided to rent uniforms from an outside vendor for the first time. That arrangement included regular laundry service for the uniforms, which the temporary workers liked because landscaping and hardscaping can be a dirty business. For some of the workers, it meant fewer trips to the laundromat, and for others it simply meant having to do less laundry.

73.     It is undisputed that CS Lawn accurately stated the amount that would be deducted from each paycheck when, in 2015, CS Lawn told the workers what the uniform charges would be and how those charges would be deducted (i.e., $18.62 per pay period).

74.     However, the paperwork CS Lawn had submitted months earlier to DOL stated a lower deduction ($13.66), an amount that later became outdated because CS Lawn's vendor increased the price to launder the uniforms. DOL never contended or presented evidence that $13.66 was an incorrect price at the time CS Lawn submitted that deduction amount in its H-2B paperwork.

75.     Solely because the deduction in the paperwork was different from the deduction in practice, the ALJ concluded these deductions also were "prohibited" and ordered CS Lawn to pay $2,083.20 in back wages (the $4.96 "over" deduction multiplied by 21 workers multiplied by 20 deductions) and a $1,000 penalty.

76.     The assessment was not based on any allegation or evidence that the workers were overcharged or otherwise did not receive the value of the deductions.

<u>The Remainder of the ALJ's Decision</u>

77.     The ALJ affirmed the agency's finding that CS Lawn overstated its need for temporary workers by applying for visas for two of the H-2B workers' wives so they could accompany their husbands to the U.S. in each year from 2013 to 2015. The women were not expected to perform landscaping or hardscaping services, but the women had in fact performed some work for CS Lawn over the years. CS Lawn employees also testified that these women had not factored into the calculation of the number of workers that CS Lawn applied for every year. Nonetheless, for this alleged violation, the ALJ ordered CS Lawn to pay $2,500 per year for a total civil monetary penalty of $7,500.

78.     The ALJ also affirmed the agency's finding that CS Lawn violated DOL regulations by failing to fully advise potential domestic U.S. workers of the wages available on the job. According to the ALJ, when applying for the H-2B program in 2013 and 2014, CS Lawn

did not "inform potential U.S. workers that" they also could earn more than the advertised wages based on their experience, even though the relevant job order included the qualification that wages were "DOE (Depends on Experience)." For this alleged violation, the ALJ ordered CS Lawn to pay $2,500 per year for a total civil monetary penalty of $5,000.

**Before the Administrative Review Board**

79.     As required by DOL regulations, CS Lawn appealed the ALJ's opinion to DOL's Administrative Review Board ("ARB").

80.     On April 4, 2022, the ARB issued a decision affirming the ALJ in most respects. A copy of the ARB's decision is attached as Exhibit C.

81.     The ARB first rejected CS Lawn's argument that DOL's 2008 regulations for the H-2B program were unenforceable because Congress assigned rulemaking authority to DHS and not DOL. The ARB relied on its prior decision concluding that the regulations were enforceable against any employer who, like CS Lawn, had applied to participate in the H-2B program before the March 2015 injunction.

82.     The ARB affirmed the $7,500 civil monetary penalty and $36,000 in back wages based on CS Lawn's alleged violation of the county zoning code. It reasoned that the technical zoning violation meant "the housing was not 'customarily furnished'" under the Fair Labor Standards Act (which is incorporated by reference into the H-2B paperwork) and thus could not be a "reasonable" deduction.

83.     The ARB also affirmed the award of penalties and back wages for the uniform deductions. The ARB justified this deduction on a breach of contract theory: In its view, CS Lawn had "disclosed a uniform deduction of $13.66 in the employment contract" and violated the contract when it altered the deduction to a higher amount.

84.     Finally, the ARB next affirmed the ALJ's determination that CS Lawn was liable for two additional minor violations. As punishment for CS Lawn's overstating its need for workers in 2014 and 2015, the board affirmed the $5,000 civil monetary penalty. As to CS Lawn overpaying temporary workers in 2014, the ARB also affirmed the $2,500 penalty and reasoned that, "[a]lthough [CS Lawn] may have advertised the same wage information" to all workers, its "practice of paying a higher wage rate" to temporary workers based on their experience "may have misled U.S. workers into not applying for the positions."

85.     The ARB modified the ALJ's opinion in only one respect. For both of the two minor violations discussed above, the DOL conceded (and the ARB thus concluded) that the claims were barred by the applicable statute of limitations for conduct occurring before 2013. Based on this concession, the ARB reduced CS Lawn's total civil penalties by $5,000 ($2,500 for each of these two violations in 2013).

86.     Thus, after CS Lawn spent years and thousands of dollars defending itself in DOL proceedings prosecuted and presided over solely by DOL employees—under regulations DOL promulgated (and resuscitated)—it was ordered to pay $54,083.20 ($38,083.20 in back wages, $16,000 in civil monetary penalties) for violations that never harmed a single H-2B worker.

## CLAIMS

### Count I:

### DOL's H-2B Enforcement Procedures Violate Article III

### (5 U.S.C. § 706(2)(B))

87.     The allegations of ¶¶ 1-86 are incorporated here in full.

88.     Article III, Section 1 of the U.S. Constitution states that the "judicial power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress

may from time to time ordain and establish." Article III further provides for various protections for the judges of these Article III courts in order to guarantee judicial independence.

89.     Under Article III, this "judicial Power shall extend to *all* Cases, in Law and Equity, arising under . . . the Laws of the United States" (emphasis added).

90.     Applying these provisions, the Supreme Court has held that cases implicating an individual's "private rights" must be tried before an Article III court.

91.     The "private rights" inquiry calls for a historical analysis that asks whether a case involves issues of the sort that historically would have been adjudicated in the courts or whether, instead, it involves issues that historically could have been resolved by the executive without any need for judicial involvement.

92.     An order to pay a civil monetary penalty implicates private rights because such a penalty would historically have been litigated in the common law courts. *See Tull v. United States*, 481 U.S. 412 (1987); *see also Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022).

93.     An order to pay back wages implicates private rights because back wages are a form of damages that would historically have been sought through an action at common law. *See Chauffeurs Local 391 v. Terry*, 494 U.S. 558 (1990).

94.     That is particularly true where, as here, liability is imposed on a breach-of-contract theory. DOL assessed liability here because it held that the zoning violation and the uniform deductions resulted in a breach of CS Lawn's contract with its H-2B workers. That type of breach of contract theory involves paradigmatic private rights.

95.     More broadly, an order to pay money to the government—either in the form of a civil monetary penalty or in the form of back wages—affects a person's private rights because it results in the confiscation of their private property.

96.     Because the proceeding here involved an attempt to force CS Lawn to pay money to the government, the proceeding implicated private rights and should have been brought before an Article III court.

97.     Moreover, this violation of Article III is compounded by the fact that Congress has not authorized DOL to adjudicate these types of claims (and has only vested such authority in DHS). Such adjudication would violate Article III even if it *was* authorized by Congress, but an agency certainly cannot assume the authority to adjudicate private rights without Congressional authorization.

98.     These violations are further compounded by DOL's position that interest begins to accrue on its award as soon as ARB issues its decision. It violates Article III for an agency court to issue a decision that is treated as if it were the equivalent of a final judgment of an Article III court.

99.     Because DOL's adjudicatory procedures violate Article III, the decision below should be vacated and DOL should be enjoined from taking any action to enforce that decision.

100.    Should the agency decide to pursue its claims against CS Lawn in federal court, then CS Lawn hereby invokes its right under the Seventh Amendment to a trial by jury on all issues so triable.

## Count II:
### DOL's H-2B Enforcement Procedures Violate The Seventh Amendment
### (5 U.S.C. § 706(2)(B))

101.    The allegations of ¶¶ 1-86 are incorporated here in full.

102.    The Seventh Amendment to the U.S. Constitution provides that, "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by

jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."

103.     As with Article III, the Supreme Court has held that this Seventh Amendment right to trial by jury applies to actions implicating a litigant's private rights. Thus, the Seventh Amendment right applies to those actions that historically would have been litigated before a jury at common law.

104.     An order to pay a civil monetary penalty implicates the Seventh Amendment because such a penalty would historically have been litigated in the common law courts before a common law jury. *See Tull v. United States*, 481 U.S. 412 (1987); *see also Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022).

105.     An order to pay back wages implicates the Seventh Amendment because back wages are a form of damages that would historically have been sought through an action at common law before a common law jury. *See Chauffeurs Local 391 v. Terry*, 494 U.S. 558 (1990).

106.     More broadly, an order to pay money to the government—either in the form of a civil monetary penalty or in the form of back wages—affects a person's private rights because it results in the confiscation of their private property.

107.     Because the proceeding here involved an attempt to force CS Lawn to pay money to the government in the form of civil monetary penalties and back wages, adjudication in an agency court without any jury right violated the Seventh Amendment.

108.     At no point did a jury find any facts underlying DOL's decision below. Instead, DOL reached its decision based on allegations made by DOL investigators and prosecutors,

which became findings of fact after an agency ALJ reviewed and adopted them, and which became further insulated by the ARB's approval of the ALJ's decision.

109.    Respect for the trial by jury in this type of case would not dismantle the statutory scheme (as these are classic employment issues), would not impede swift resolution of these claims (as the agency proceedings are in no sense swift), and does not involve issues unknown to the common law (as these are in fact remedies that historically were available at common law).

110.    For the reasons stated above, this claim is not barred by the Supreme Court's rejection of a Seventh Amendment claim in *Atlas Roofing Co. v. Occupational Safety & Health Review Commission*, 430 U.S. 442 (1977). The decision in *Atlas Roofing* has been undermined by later cases and, in any event, can be distinguished. But, to the extent that this claim might instead be barred by *Atlas Roofing*, then *Atlas Roofing* should be overruled.

111.    Because DOL's adjudicatory procedures violate the Seventh Amendment, the decision below should be vacated and DOL should be enjoined from taking any action to enforce that decision.

112.    Should the agency decide to pursue its claims against CS Lawn in federal court, then CS Lawn hereby invokes its right under the Seventh Amendment to a trial by jury on all issues so triable.

## Count III:

## DOL's Agency Judges Enjoy Unconstitutional Protection From Removal
### (5 U.S.C. § 706(2)(B))

113.    The allegations of ¶¶ 1-86 are incorporated here in full.

114.    In addition to violating the structural provisions of Article III, as well as the Seventh Amendment, provisions governing DOL's in-house ALJs *also* violate structural provisions governing the executive branch under Article II.

115.    The Constitution vests "[t]he executive Power . . . in a President" who must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1; *id.* § 3. The President is charged with overseeing executive officers and, to wield that authority, must have the ability to remove executive-branch officers. *See Free Enter. Fund v. PCAOB*, 561 U.S. 477 (2010).

116.    By contrast, DOL's ALJs enjoy unconstitutional dual-layer protection from removal. ALJs can only be removed for good cause, which must be found by the Merit Systems Protection Board, U.S.C. § 7521(a), (b), and members of the Merit Systems Protection Board can themselves only be removed upon a finding of "inefficiency, neglect of duty, or malfeasance in office," 5 U.S.C. § 1202(d).

117.    This unconstitutional protection from removal necessarily harmed CS Lawn, insofar as CS Lawn was forced to adjudicate its case before an ALJ who was not removable as required by the Constitution, and the ALJ made numerous decisions and factual findings that affected CS Lawn's rights in large and small ways.

118.    Because DOL's adjudicatory procedures violate the structural constitutional provisions of Article II, the decision below should be vacated and DOL should be enjoined from taking any action to enforce that decision.

### Count IV:
### The Penalty Imposed In This Case Is An Excessive Fine
### (5 U.S.C. § 706(2)(B))

119.    The allegations of ¶¶ 1-86 are incorporated here in full.

120.    The agency imposed $7,500 in civil monetary penalties and $36,000 in back wages for alleged violations of a county zoning code.

121.    DOL imposed the monetary award without any consideration for the actual amount of harm experienced by the employees. Instead, DOL concluded that *any* departure from

an employer's H-2B paperwork constitutes "harm," and the ARB concluded that these monetary awards were necessary to ensure compliance with the H-2B program.

122. The workers were not harmed at all by the county zoning code violation, which DOL conceded was the only reason the related rental deductions were improper. In fact, multiple employees lived in the apartment for multiple years, suggesting the temporary workers got good value for their money and were not harmed by the technical zoning violation.

123. Because this monetary award is justified on grounds of deterrence, these monetary awards are punitive and therefore subject to review under the Excessive Fines Clause.

124. The Supreme Court has held that monetary forfeitures are excessive if they are "grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). Moreover, the Supreme Court has held that punitive damages awards are generally excessive if they exceed the amount of the actual damages incurred. *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 497 (2008). In this case, the monetary award vastly exceeds any damages incurred by the workers and is, therefore, excessive.

125. As a remedy for this violation of the Excessive Fines Clause, the Court should hold a hearing, and empanel a Seventh Amendment jury, to determine the actual harm (if any) suffered by the employees and should reduce the size of the award to an amount no more than double the actual damages incurred as a result of the county zoning code violation.

## Count V:

## The Agency's Decision Is Not Supported By Substantial Evidence, Is An Abuse Of Discretion, And Is Not In Accordance With Law

### (5 U.S.C. § 706(2)(A), (E))

126. The allegations of ¶¶ 1-86 are incorporated here in full.

127.     Under the APA, agency action may be overturned if it is not supported by substantial evidence, if it is an abuse of discretion, or if it is otherwise not in accordance with law. As set forth above, CS Lawn disputes that any such standard should apply here. However, in the alternative, the agency decision in this case fails review even under that deferential standard.

128.     First, DOL's entire decision below was not supported by substantial evidence, constitutes an abuse of discretion, and is not in accordance with law because the agency was prosecuting CS Lawn under invalid regulations that the agency promulgated without statutory authority in 2008. Congress assigned rulemaking authority to DHS, not DOL. The entire DOL decision then is premised upon faulty regulations and, thus, is not in accordance with law.

129.     Second, the award of back wages and penalties for the county zoning code violation is not supported by substantial evidence, constitutes an abuse of discretion, and is not in accordance with law because no federal law or regulation allows DOL to enforce compliance with local zoning laws. A technical violation of a local zoning law certainly is not the kind of "substantial" or "willful" violation that can support liability under DOL's regulations.

130.     Third, the award of $36,000 in back wages for the county zoning code violation is not supported by substantial evidence, constitutes an abuse of discretion, and is not in accordance with law because the evidence did not support a finding that the employees were actually owed $36,000 in back wages. If CS Lawn had not made any apartments available to temporary workers for rent, which CS Lawn was not required to do by any regulation or provision in the H-2B program, the employees would have been forced to find another place to live. So, the entire cost of the rental deductions cannot be counted as a loss to the employees.

131.     Fourth, the $7,500 civil monetary penalty for the county zoning code violation is not supported by substantial evidence, constitutes an abuse of discretion, and is not in accordance

24

with law insofar as the monetary penalty vastly exceeds the amount of any harm to the workers and is also duplicative of the award of back wages.

## REQUEST FOR RELIEF

In light of the foregoing, Plaintiff CS Lawn respectfully requests the following relief:

A.     An injunction enjoining the Defendants from enforcing the decisions of the ALJ and the Administrative Review Board or commencing any action to collect the amounts claimed in the February 2018 Determination Letter from CS Lawn;

B.     A declaration that the Department's procedures for imposing civil monetary penalties and back wages for alleged violations of the H-2B program violate Article III and the Seventh Amendment to the U.S. Constitution;

C.     A declaration that the monetary award in this case violated the Excessive Fines Clause of the U.S. Constitution;

D.     A declaration that the decision below was not supported by substantial evidence and was otherwise contrary to law;

E.     An award of Plaintiff's costs and expenses of this action, together with reasonable attorneys' fees, under the Equal Access to Justice Act or otherwise; and

F.     Any other legal or equitable relief to which Plaintiff may show itself to be justly entitled.

Dated: May 30, 2023                              Respectfully submitted,

                                                 /s/ Robert M. Belden
                                                 Robert M. Belden
                                                 DC Bar No. 1035488
                                                 INSTITUTE FOR JUSTICE
                                                 901 N. Glebe Rd., Suite 900
                                                 Arlington, VA 22203
                                                 Phone: (703) 682-9320
                                                 rbelden@ij.org

Robert E. Johnson
DC Bar No. 1013390
INSTITUTE FOR JUSTICE
16781 Chagrin Blvd. #256
Shaker Heights, OH 44120
(703) 682-9320
rjohnson@ij.org