**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| C.S. LAWN & LANDSCAPE, INC., | |
| Plaintiff, | |
| v. | Case No. 1:23-cv-01533-TSC |
| U.S. DEPARTMENT OF LABOR, *et al.*, | |
| Defendants. | |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

BACKGROUND ................................................................................................... 3

I.      The H-2B framework. ................................................................................ 3

II.     The Labor Department's H-2B enforcement system. ................................ 4

III.    CS Lawn's H-2B violations and proceedings........................................... 6

LEGAL STANDARDS ......................................................................................... 8

ARGUMENT ......................................................................................................... 8

I.      The Department of Labor's adjudication does not violate Article III or the
        Seventh Amendment. ................................................................................ 8

        A.      The Department of Labor is adjudicating only public rights that do not
                require a jury in federal court. ...................................................... 8

        B.      CS Lawn impliedly consented to the Labor Department's adjudication........ 14

II.     The Department of Labor's Administrative Law Judges do not violate the
        President's removal power. .................................................................... 15

        A.      CS Lawn forfeited its removal claims by failing to raise them
                with the agency. ........................................................................ 15

        B.      CS Lawn has no viable removal claim because it cannot show any harm
                from the purported removal restrictions....................................... 17

        C.      The Department of Labor's ALJs are permissibly protected from removal.....18

III.    The Department of Labor's imposition of back pay and penalties is in
        accordance with law and fully supported by the record. ....................... 21

        A.      The Labor Department properly enforced its 2008 H-2B regulations. ............21

        B.      The Labor Department is fully authorized to assess back wages. ..................23

        C.      The Department of Labor's imposition of back pay is fully supported by
                the record and is neither arbitrary nor capricious. .........................24

                1.      CS Lawn made improper deductions from worker's pay for
                        housing and uniforms. ....................................................24

2.    The award of back wages was fully in line with the Labor Department's regulations...................................................26

IV.    The Labor Department did not violate the Excessive Fines Clause. ......................27

CONCLUSION ...........................................................................................................30

# TABLE OF AUTHORITIES

## Cases

*Am. Bioscience, Inc. v. Thompson*,
269 F.3d 1077 (D.C. Cir. 2001) ............................................................... 8

*Apple Inc. v. Voip-Pal.com, Inc.*,
976 F.3d 1316 (Fed. Cir. 2020) .............................................................. 24

*Arizona v. United States*,
567 U.S. 387 (2012) ............................................................................. 10

*Arriaga v. Fla. Pac. Farms, L.L.C.*,
305 F.3d 1228 (11th Cir. 2002) ............................................................. 27

*Atlas Roofing Co. v. Occupational Safety and Health Rev. Comm'n*,
430 U.S. 442 (1977) ............................................................................. 12

*Austin v. United States*,
509 U.S. 602 (1993) ............................................................................. 29

*Bayou Lawn v. Sec'y of Lab.*,
713 F.3d 1080 (11th Cir. 2013) ............................................................. 23

*Bd. of Trs. of Univ. of Ill. v. United States*,
289 U.S. 48 (1933) ............................................................................... 10

*Bhatti v. Fed. Hous. Fin. Agency*,
97 F.4th 556 (8th Cir. 2024) ................................................................. 18

*Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*,
492 U.S. 257 (1989) ........................................................................ 28, 29

*Carr v. Saul*,
593 U.S. 83 (2021) ........................................................................... 16, 17

*CFPB v. Law Offs. of Crystal Moroney, P.C.*,
63 F.4th 174 (2d Cir. 2023) .................................................................. 18

*Collins v. Yellen*,
594 U.S. 220 (2021) ................................................................... 2, 17, 18

*Colorado Dep't of Lab. & Emp. v. Dami Hosp., LLC*,
442 P.3d 94 (Colo. 2019) ..................................................................... 29

*Commodity Futures Trading Comm'n v. Schor*,
478 U.S. 833 (1986) ............................................................................. 14

*Crowell v. Benson,*
     285 U.S. 22 (1932) ................................................................. 12, 14

*CTS Corp. v. EPA,*
     759 F.3d 52 (D.C. Cir. 2014) ......................................................... 8

*Decker Coal Co, v. Pehringer,*
     8 F.4th 1123 (9th Cir. 2021) ............................................. 18, 20, 21

*Dep't of Homeland Sec. v. Thuraissigiam,*
     591 U.S. 103 (2020) ................................................................. 13

*Dep't of State v. Muñoz,*
     602 U.S. 899 (2024) ................................................................. 13

*Elgebaly v. Garland,*
     109 F.4th 426 (6th Cir. 2024) ...................................................... 12

*FCC v. Prometheus Radio Project,*
     592 U.S. 414 (2021) ......................................................... 21, 25, 28

*Fleming v. U.S. Dep't of Agric.,*
     987 F.3d 1093 (D.C. Cir. 2021) ..................................................... 16

*Frank's Nursery, LLC v. Walsh,*
     2022 WL 2757373 (S.D. Tex. July 14, 2022) ............................. 1, 13, 15

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
     561 U.S. 477 (2010) ....................................................... 2, 19, 20, 21

*Gibbons v. Ogden,*
     22 U.S. (9 Wheat.) 1 (1824) ..................................................... 10, 22

*K & R Contractors, LLC v. Keene,*
     86 F.4th 135 (4th Cir. 2023) ....................................................... 18

*Kondapally v. U.S. Citizenship & Immigr. Servs.,*
     557 F. Supp. 3d 10 (D.D.C. 2021) ................................................... 8

*La. Forestry Ass'n Inc. v. Sec'y U.S. Dep't of Lab.,*
     745 F.3d 653 (3d Cir. 2014) ..................................................... 3, 11

*Legal Tender Cases,*
     79 U.S. 457 (1870) ................................................................... 9

*Liu v. SEC,*
     591 U.S. 71 (2020) ................................................................... 9

*Lloyd Sabaudo Societa Anonima Per Azioni v. Elting*,
    287 U.S. 329 (1932) ................................................................................ 11

*Morrison v. Olson*,
    487 U.S. 654 (1988) ............................................................................2, 20

*Murray's Lessee v. Hoboken Land & Imp. Co.*,
    59 U.S. (18 How.) 272 (1855) ..............................................................10, 12

*Myers v. United States*,
    272 U.S. 52 (1926) .................................................................................. 19

*Noriega-Perez v. United States*,
    179 F.3d 1166 (9th Cir. 1999) ..............................................................11, 12

*Oceanic Steam Nav. Co. v. Stranahan*,
    214 U.S. 320 (1909) .....................................................................10, 11, 12, 13

*Oil States Energy Services, LLC v. Greene's Energy Group, LLC*,
    584 U.S. 325 (2018) ..............................................................................9, 10

*Outdoor Amusements Bus. Ass'n v. Dep't of Homeland Sec.*,
    983 F.3d 671 (4th Cir. 2020) ................................................................. 23

*Pharaon v. Bd. of Governors of Fed. Rsrv. Sys.*,
    135 F.3d 148 (D.C. Cir. 1998) ............................................................... 28

*Remileh v. INS*,
    101 F.3d 66 (8th Cir. 1996) ................................................................... 13

*SEC v. Jarkesy*,
    144 S. Ct. 2117 (2024) ......................................................................*passim*

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020) ............................................................................... 19

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ................................................................................. 9

*Stern v. Marshall*,
    564 U.S. 462 (2011) ....................................................................10, 12, 15

*Sun Valley Orchards, LLC v. U.S. Dep't of Lab.*,
    2023 WL 4784204 (D.N.J. July 27, 2023) ...........................................*passim*

*Timbs v. Indiana*,
    139 S. Ct. 682 (2019) ............................................................................ 28

*U.S. Shoe Corp. v. United States,*
    296 F.3d 1378 (Fed. Cir. 2002) ............................................................. 9

*United States v. Bajakajian,*
    524 U.S. 321 (1998) .................................................................... 28, 29

*United States v. Bikundi,*
    926 F.3d 761 (D.C. Cir. 2019) ................................................. 28, 29, 30

*United States v. Chaplin's, Inc.,*
    646 F.3d 846 (11th Cir. 2011) ............................................................. 28

*United States v. Perkins,*
    116 U.S. 483 (1886) ......................................................................... 19

*United States v. Pilgrim Mkt. Corp.,*
    944 F.2d 14 (1st Cir. 1991) ................................................................ 28

*United States v. Toth,*
    33 F.4th 1 (1st Cir. 2022),
    *cert. denied*, 143 S. Ct. 552 (2023) ............................................... 29, 30

*Velasquez-Tabir v. INS,*
    127 F.3d 456 (5th Cir. 1997) ............................................................. 13

*Villegas-Valenzuela v. INS,*
    103 F.3d 805 (9th Cir. 1996) ............................................................. 13

*Wellness Int'l Network, Ltd. v. Sharif,*
    575 U.S. 665 (2015) .................................................................... 14, 15

*Wnuck v. Comm'r,*
    136 T.C. 498 (T.C. 2011) .................................................................. 24

*Wood v. Milyard,*
    566 U.S. 463 (2012) ......................................................................... 21

**Statutes**

5 U.S.C. § 1202(d) .................................................................................. 20

5 U.S.C. § 7521(a) .................................................................................. 20

8 U.S.C. § 1101(a)(15)(H)(ii)(b) ........................................................... 3, 11

8 U.S.C. § 1184(c)(14)(A) ......................................................................... 5

8 U.S.C. § 1184(c)(14)(A)(i) ............................................................ 2, 5, 24

8 U.S.C. § 1184(c)(l4)(B) ....................................................................................... 4

8 U.S.C. § 1184(g)(l)(B) ......................................................................................... 3

8 U.S.C. § 1188(g)(2) ........................................................................................... 13

8 U.S.C. § 1324a ............................................................................................. 11, 14

8 U.S.C. § 1324c ................................................................................................. 12

**The Constitution**

U.S. Const. art. I, § 8 ........................................................................................ 9, 10

U.S. Const. art. II, § 1 .......................................................................................... 19

U.S. Const. art. II, § 2 .......................................................................................... 19

U.S. Const. art. IV, § 3 ........................................................................................... 9

U.S. Const. amend. VIII ........................................................................................ 28

**Legislative Materials**

H.R. Rep. No. 99-682 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5649, 5654 ..................... 1, 11

**Regulations**

8 C.F.R. § 214.2(h)(6)(iv)(A) ................................................................................... 3

20 C.F.R. § 503.20 .............................................................................................. 27

20 C.F.R. § 503.20(a) ........................................................................................... 27

20 C.F.R. § 655.l(b) (2009) ..................................................................................... 3

20 C.F.R. § 655.15 ............................................................................................... 3

20 C.F.R. § 655.22 ............................................................................................... 4

20 C.F.R. § 655.22(a) ............................................................................................ 4

20 C.F.R. § 655.22(g)(1) ........................................................................... 4, 25, 26, 27

20 C.F.R. § 655.22(n) ............................................................................................ 4

20 C.F.R. § 655.50 ............................................................................................... 4

20 C.F.R. § 655.60 ............................................................................................... 5

20 C.F.R. § 655.65(a) .................................................................. 5

20 C.F.R. § 655.65(f) .................................................................. 4

20 C.F.R. § 655.65(i) .................................................................. 5

29 C.F.R. § 18.101 ................................................................... 16

29 C.F.R. § 18.80(c) ............................................................ 16, 17

29 C.F.R. § 503.1(d) ................................................................ 23

29 C.F.R. § 531.31 ............................................................ 25, 26

29 C.F.R. § 503.40(b) (2015) ..................................................... 5

29 C.F.R. § 503.41 ..................................................................... 5

29 C.F.R. § 503.43 ................................................................... 16

29 C.F.R. § 503.51 ................................................................... 17

Secretary's Order 01-2020
    85 Fed. Reg. 13187 (Mar. 6, 2020) ....................................... 6

**Other Authorities**

David E. Engdahl, *The Spending Power*,
    44 Duke L.J. 1 (1994) ............................................................ 9

Include, Black's Law Dictionary (11th ed. 2019) .......................... 24

Jeffrey T. Renz, *What Spending Clause?*,
    33 J. Marshall L. Rev. 81 (1999) ............................................. 9

## INTRODUCTION

Under Congress's foreign-commerce and immigration powers, the United States has long provided temporary work authorization for foreign workers. To that end, the "H–2 program, in one form or another, has been an element of U.S. immigration policy since the 1940's."[1] H.R. Rep. No. 99-682(I), at 50 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5649, 5654. Now, after years of implementation, Plaintiff C.S. Lawn and Landscape, Inc. contends that the Labor Department's enforcement regime—which uses administrative law judges (ALJs) to adjudicate H-2B violations—contravenes Articles II and III of the Constitution as well as the Seventh Amendment. CS Lawn never raised those constitutional objections in four years of litigation before the agency, and the Court should reject them now.

Nothing about the Labor Department's adjudicatory regime violates Article III or the Seventh Amendment. The Supreme Court has long held, and recently affirmed, that Congress's "plenary power over immigration" and other "historic categories of adjudications fall within the" public-rights doctrine, which means that such cases can be adjudicated outside federal courts without a jury. *SEC v. Jarkesy*, 144 S. Ct. 2117, 2132–33 (2024). And given Congress's straightforward use of its foreign-commerce and immigration powers to enact the H-2B regime, the Labor Department acted well within constitutional bounds by adjudicating CS Lawn's H-2B violations. That's why district courts have recently rejected the *exact* arguments that Plaintiff makes here. *See Sun Valley Orchards, LLC v. U.S. Dep't of Lab.*, 2023 WL 4784204, at *1 (D.N.J. July 27, 2023); *Frank's Nursery, LLC v. Walsh*, 2022 WL 2757373, at *8 (S.D. Tex. July 14, 2022). Not to mention that CS Lawn impliedly consented to non-Article III adjudication by failing to raise these constitutional objections with the agency.

Nor do the Department's adjudications pose any Article II problems. For starters, Plaintiff forfeited this claim, too, by failing to raise it with the agency. But, in any event, the

---

[1] The Immigration Reform and Control Act of 1986 separated the H-2 program into two temporary-worker programs: H-2A for agricultural workers and H-2B for non-agricultural workers.

Secretary of Labor properly appointed the ALJ who handled CS Lawn's case. This resolves Plaintiff's removal-power claim because "there is no reason to regard any of the actions taken by the" ALJ "as void" if there is no Appointments Clause violation. *Collins v. Yellen*, 594 U.S. 220, 257–58 (2021). But even if the Court reaches the merits of Plaintiff's removal-power claim, the good-cause removal restriction on ALJs is straightforwardly allowable because it is the President—or the Secretary of Labor he can remove at will—who "decide[s] whether the officer's conduct merit[s] removal under the good-cause standard." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 495 (2010). And on-point Supreme Court case law makes clear that such removals are permissible even if they are later reviewed by another body. *Morrison v. Olson*, 487 U.S. 654, 663–64, 686–93 (1988). So it is unsurprising that other courts have upheld the removal restrictions on Labor Department ALJs.

Plaintiff's remaining claims fare no better. On CS Lawn's APA claim, the agency had full authority to enforce its 2008 H-2B regulation for CS Lawn's violations in 2013, 2014, and 2015, which all occurred before that regulation was enjoined prospectively by a Florida district court. And the Labor Department acted well within its authority by assessing back wages under its power to "impose such administrative remedies" as the Secretary of Labor "determines to be appropriate." 8 U.S.C. 1184(c)(14)(A)(i). In the end, the agency reasonably adjudicated Plaintiff's H-2B violations and reasonably explained its decision to order $38,083.20 in back wages (money owed to workers) and $16,000 in civil monetary penalties, most of which CS Lawn doesn't contest here. For the same reasons, there is no violation of the Eighth Amendment's Excessive Fines Clause. The agency imposed appropriate penalties for CS Lawn's H-2B violations, far below what it *could have* imposed.

From start to finish, Plaintiff's claims are meritless. CS Lawn voluntarily chose to participate in the H-2B program and it cannot now escape liability for its H-2B violations with belated and baseless constitutional and APA challenges. The Court should grant summary judgment for Defendants.

2

**BACKGROUND**

I.    **The H-2B framework.**

"The Immigration and Nationality Act of 1952 established the modern framework for regulation of immigration in the United States, including provisions for the admission of permanent and temporary foreign workers." *La. Forestry Ass'n Inc. v. Sec'y U.S. Dep't of Lab.*, 745 F.3d 653, 659 (3d Cir. 2014).  "In 1986, Congress enacted the Immigration Reform and Control Act of 1986, which amended the INA by, among other things, bifurcating the H–2 visa program into the H–2A and H–2B programs, which govern the admission of agricultural and nonagricultural workers, respectively." *Id.*  Under the H-2B program, qualifying employers may hire foreign workers to perform temporary, nonagricultural work "if unemployed persons capable of performing such service or labor cannot be found in this country."[2]  8 U.S.C. § 1101(a)(15)(H)(ii)(b).  Before hiring H-2B workers, a prospective employer must first apply for and obtain a "temporary labor certification" from the Department of Labor, which certifies that sufficient capable American workers are not available and that noncitizen employment will not "adversely affect the wages and working conditions of similarly employed United States workers." *Id.* § 214.2(h)(6)(iii)(A).  Employers must then petition the Department of Homeland Security for temporary admission of H-2B workers.  20 C.F.R. § 655.l(b) (2009)[3]; 8 C.F.R. § 214.2(h)(6)(iv)(A).

To that end, the certification process has various requirements.  For example, employers must attempt to recruit U.S. workers for the job, including submitting a job offer to the relevant state agency and advertising the job in newspapers, both of which must include a description of the job duties and the wage offered.  20 C.F.R. §§ 655.15, 655.17.  The H-2B regulations also require that the "job offer must specify all deductions not required by law,"

---

[2] There can be no more than 66,000 H-2B visas each year.  8 U.S.C. § 1184(g)(l)(B).

[3] Unless otherwise indicated, all references to 20 C.F.R. Part 655, subpart A are to the regulations published on December 19, 2008, which became effective on January 18, 2009. U.S. Dep't of Labor, Emp't & Training Admin., *Labor Certification Process and Enf't for Temp. Emp't in Occupations Other Than Agric. or Registered Nursing in the U.S. (H–2B Workers), & Other Tech. Changes*, 73 Fed. Reg. 78,020, 78,047, 2008 WL 5262663 (Dec. 19, 2008) ("2008 Rule").

that all deductions "must be reasonable," and that H-2B employers covered by the Fair Labor Standards Act not "make deductions that would violate the FLSA." 20 C.F.R. § 655.22(g)(1). And the employer must certify, under penalty of perjury, that the information contained in its application to the Labor Department is true and accurate. 20 C.F.R. § 655.65(f), 73 Fed. Reg. 78020, 78035 (Dec. 19, 2008).

Employers voluntarily choose to participate in the H-2B program because it confers benefits not afforded to other employers in the United States: the ability to hire foreign workers to fulfill temporary labor needs. To obtain these benefits, however, an employer must agree to abide by the terms and obligations of the H-2B program. 20 C.F.R. § 655.65(f). Those obligations include, among others, the requirement to offer to U.S. workers terms and working conditions of employment that "are not less favorable than those offered to the H-2B worker(s)," 20 C.F.R. § 655.22(a), and the requirement to truly and accurately represent the "dates of temporary need, reason for temporary need, and number of positions being requested." 20 C.F.R. § 655.22(n).

## II.    The Labor Department's H-2B enforcement system.

Effective in 2009, the Department of Homeland Security delegated to the Department of Labor its investigative and enforcement authority over the H-2B program, including the authority to impose administrative remedies. *See* 8 U.S.C. § 1184(c)(l4)(B); 2008 Rule, 73 Fed. Reg. at 78,046. This authority was delegated within the Labor Department to the Wage and Hour Division Administrator. 20 C.F.R. § 655.50. With these delegations, the Labor Department's 2008 Rule set forth employer obligations, 20 C.F.R. § 655.22, as well as the Wage and Hour Division's H-2B enforcement process, 20 C.F.R. § 655.50–.70.[4]

---

[4] The 2008 Rule was prospectively enjoined in 2015. *See Perez v. Perez*, No. 14-cv-682, ECF Nos. 14 & 62 (N.D. Fla. Sept. 4, 2015). The Labor Department has therefore applied that rule to enforce the conditions of labor certifications issued under the 2008 Regulations prior to the injunction's effective date. *See* Argument Section III.A., *infra*.

After conducting an investigation, the Administrator determines whether a violation has occurred, including whether the employer willfully misrepresented a material fact or substantially failed to meet the applicable conditions. 8 U.S.C. § 1184(c)(14)(A); 20 C.F.R. § 655.60. If so, the Administrator may "impose such administrative remedies (including civil monetary penalties in an amount not to exceed $10,000 per violation)" as she "determines to be appropriate."[5]  8 U.S.C. § 1184(c)(14)(A)(i). These other "administrative remedies" may include reinstatement of displaced U.S. workers, back wages, and any other appropriate legal or equitable remedies. *See* 20 C.F.R. § 655.65(i).

To institute administrative proceedings, the Administrator issues a written determination letter explaining the Administrator's findings as well as the sanctions and remedies sought. 29 C.F.R. §§ 503.41, 503.42.[6] Any employer "desiring review of" the Administrator's determination, "including judicial review," must "make a request for [ ] an administrative hearing in writing" within 30 days. *Id.* § 503.43. An ALJ is then assigned to the case. *Id.* § 503.48(a). Litigation before the ALJ is adversarial. In fact, Labor Department regulations specify that "[t]he Federal Rules of Civil Procedure (FRCP) apply in any situation not provided for," *id.* § 18.10(a); *see also id.* § 503.44(a). The parties can move to dismiss, *id.* § 18.70(c), take discovery, *id.* § 18.50–.65, and move for the equivalent of summary judgment, *id.* § 18.72(a). There may also be the equivalent of a bench trial where the parties present

---

[5] Civil monetary penalties are assessed differently for different types of H-2B violations. For violations involving willful wage violations, the agency may assess penalties "equal to the difference between the amount that should have been paid and the amount that actually was paid to such nonimmigrant(s), not to exceed $10,000." 20 C.F.R. § 655.65(a). For other violations involving "any substantial failure to meet the conditions" in the application or "any willful misrepresentation in the application or petition," *id.* § 655.65(c), the agency must consider the type of violation committed and other relevant factors such as the previous history of H-2B violations by the employer, the number of workers affected by the violation, the gravity of the violation, and the employer's commitment to future compliance. *Id.* § 655.65(g).

[6] Regardless of when a violation occurs, the relevant procedures are governed by the 2015 Rule jointly promulgated by the Departments of Labor and Homeland Security. *See* 29 C.F.R. § 503.40(b) (2015).

evidence and testimony to the ALJ, after which the ALJ "must issue a written decision and order." *Id.* § 18.81–.82; *id.* § 18.92; *id.* § 503.50. The parties can appeal an ALJ's decision to the Labor Department's Administrative Review Board, which consists of up to five members appointed by the Secretary for four-year terms. *Id.* § 503.51; Secretary's Order 01-2020, 85 Fed. Reg. 13187 §§ 5(a), 7(a), 8(a) (Mar. 6, 2020). And any decision of the Review Board is subject to revision by the Secretary of Labor. 85 Fed. Reg. at 13187 § 6.

### III.    CS Lawn's H-2B violations and proceedings.

Plaintiff CS Lawn is a residential and commercial landscaping company based in Maryland and has participated in the H-2B program for over 20 years. AR 6665. At issue here are the H-2B applications CS Lawn submitted to the Labor Department for the 2013, 2014, and 2015 seasons. *Id.* After an investigation by the Wage and Hour Division—which was paused and later restarted due to a district court injunction—the Administrator issued a determination letter citing CS Lawn for several violations of the statute and 2008 H-2B regulations. *Id.* These violations included a substantial failure to comply with the recruitment and hiring of U.S. workers, offering less favorable terms and working conditions to U.S. workers, impermissible pay deductions, and a willful misrepresentation regarding the accuracy of its need for temporary workers. *Id.* In that letter, the Administrator determined that CS Lawn owed $147,200.84 in unpaid wages and $75,000 in civil penalties. *Id.*

CS Lawn timely requested an ALJ hearing, and Judge Morris D. Davis was assigned to the case. *Id.*; Compl ¶ 59. After various pre-trial proceedings, Judge Davis held a hearing in November 2018, involving telephonic and live testimony from multiple witnesses. *Id.*; Compl. ¶ 60, ECF No. 1. Months later, the ALJ issued a 42-page decision finding in favor of the Administrator on some, but not all, violations of the H-2B program. AR 6666; *see* AR 6429–6471. For example, the ALJ found that CS Lawn improperly offered prospective U.S. workers less favorable terms than some of its H-2B workers and willfully inflated the requested number of H-2B workers to include the wives of two workers, knowing it would not employ them. AR 6666.

As most relevant here, the ALJ also found that CS Lawn made improper deductions for uniforms and housing. *Id.* As to the uniforms, the ALJ explained that the employment contract informed workers of a uniform deduction of $13.66 per pay period but CS Lawn actually deducted $18.62 per pay period instead. *Id.* And as to housing, the ALJ found that the housing unit at 1107 Butterworth Court—where some of the H-2B workers lived—was not zoned for residential use, even though the employment contract provided for housing arrangements that "meet all applicable state and local codes for rental property." AR 6667.

The ALJ therefore ordered CS Lawn to pay $2,083.20 in back wages to 21 workers for improper uniform deductions and $36,000 in back wages for improper housing deductions. *Id.* But after expressly considering, among other things, CS Lawn's lack of previous violations and "good faith effort to comply with the program requirements," the ALJ substantially reduced CS Lawn's total civil penalties, from the $75,000 assessed by the Administrator to only $21,000. *Id.* CS Lawn then appealed to the Review Board, which issued its own 16-page decision affirming the ALJ. AR 6664–79. With one exception: the Review Board further *reduced* CS Lawn's civil penalties to only $16,000. AR 6679. Paired with $38,083.20 in back wages, CS Lawn was ordered to pay a total of $54,083.20. *Id.*; Compl. ¶ 86.

Despite litigating in the agency for four years without raising any constitutional objections, Plaintiff filed this lawsuit alleging various constitutional defects. *See* Compl. ¶¶ 87–131. CS Lawn now claims that the Labor Department's adjudication violated Article III and the Seventh Amendment, the President's Article II removal power, and the Eighth Amendment's Excessive Fines Clause. *Id.* ¶¶ 87–125. Plaintiff also advances an APA claim, alleging that the 2008 H-2B regulation was unenforceable, and that the agency's back-wage award was not supported by evidence. *Id.* ¶¶ 125–31. Defendants later answered the complaint. *See* Answer, ECF No. 10. And in accordance with the Court's scheduling order, CS Lawn has moved for summary judgment. *See* Pl.'s Mot. at 1, ECF No. 16. This cross motion follows.

## LEGAL STANDARDS

"In APA cases such as this one, involving cross-motions for summary judgment, 'the district judge sits as an appellate tribunal" and the "entire case on review is a question of law." *Kondapally v. U.S. Citizenship & Immigr. Servs.*, 557 F. Supp. 3d 10, 20–21 (D.D.C. 2021) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083–84 (D.C. Cir. 2001)). "Judicial review, when available, is typically limited to the administrative record, since it is black-letter administrative law that in an APA case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision." *Id.* (citation omitted).

## ARGUMENT

I.    **The Department of Labor's adjudication does not violate Article III or the Seventh Amendment.**

A.    **The Department of Labor is adjudicating only public rights that do not require a jury in federal court.**

To determine whether a case may be adjudicated without a jury through agency proceedings, the Supreme Court recently clarified a two-step inquiry: (1) is the action "legal in nature" (as opposed to equitable) such that it implicates the Seventh Amendment right to a civil jury, and, if so, (2) does it nonetheless concern "public rights" that can be adjudicated by an agency? *SEC v. Jarkesy*, 144 S. Ct. 2117, 2126–27, 2131 (2024). Plaintiff spends much of its argument on the former. *See* Pl.'s Mot. at 14–24. But aside from some errors in Plaintiff's analysis at that step,[7] the latter inquiry fully resolves this issue: even if the Seventh Amendment is implicated, this case plainly involves public rights.[8]

---

[7] For example, back wages are simply the "disgorgement of improper profits," which falls "squarely within the heartland of equity." *Liu v. SEC*, 591 U.S. 71, 80 (2020). They therefore do not implicate the Seventh Amendment. *Compare* Pl.'s Mot. at 16–18 (citing cases indicating that back pay is "in the nature of compensatory damages"), *with Jarkesy*, 144 S. Ct. at 2129 ("What determines whether a monetary remedy is legal is if it is designed to punish or deter the wrongdoer, or, on the other hand, solely to restore the status quo.").

[8] It's not clear how equating "money" with "private property" fits into the relevant analysis of whether an action is "legal" or "equitable" under the Seventh Amendment. *Compare* Pl.'s Mot. at 22–24, *with Jarkesy*, 144 S. Ct. at 2129. And certainly CS Lawn cites no

When determining whether a proceeding implicates Article III or the Seventh Amendment, the Supreme Court has distinguished between "public rights" that can be adjudicated outside federal courts and "private rights" that cannot. *Oil States Energy Services, LLC v. Greene's Energy Group, LLC*, 584 U.S. 325, 334 (2018). While the "Court has not definitively explained the distinction between public and private rights" and its precedents "have not been entirely consistent," one thing is crystal clear: public rights encompass "matters which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments." *Id.* Put more simply, public-rights matters are those "that can be pursued only by grace of the other branches." *Stern v. Marshall*, 564 U.S. 462, 493 (2011) (citing *Murray's Lessee v. Hoboken Land & Imp. Co.*, 59 U.S. (18 How.) 272, 284 (1855)). In such cases, "Congress can reserve to itself the power to decide, delegate that power to executive officers, or commit it to judicial tribunals." *Oil States*, 584 U.S. at 342. But as long as "Congress properly assigns a matter to

---

precedent for the remarkable proposition that violations of public rights transform into private rights simply because those violations are enforced by monetary penalties. *See* Pl.'s Mot. at 22–24. But, in any event, money is not necessarily "property" for constitutional purposes. Money is created by the federal government. *See* U.S. Const. art. I, § 8; *id.* art. I, § 10; *Legal Tender Cases*, 79 U.S. 457, 545 (1870) ("Whatever power there is over the currency is vested in Congress."). And the federal government is likewise empowered to *take* money through, for example, taxes. U.S. Cont. art. I, § 8. But not every tax is a deprivation of property under the Due Process Clause or a taking of property under the Takings Clause. *See, e.g.*, *U.S. Shoe Corp. v. United States*, 296 F.3d 1378, 1383 (Fed. Cir. 2002) (collecting cases for the proposition that the "government's act of taxation" is not a "taking of private property"). Thinking of money as "property" would also make little sense in light of the Spending and Property Clauses. Since the earliest days of the Republic, Congress's ability to spend money was thought to flow from its power to provide for the "general Welfare." U.S. Const. art. I, § 8; *South Dakota v. Dole,* 483 U.S. 203, 207 (1987). That's why James Madison and Alexander Hamilton vigorously debated that clause and its implications for congressional spending. *See* David E. Engdahl, *The Spending Power*, 44 Duke L.J. 1, 28 (1994) (detailing the Madison-Hamilton debate); Jeffrey T. Renz, *What Spending Clause?*, 33 J. Marshall L. Rev. 81 (1999) (same). But there was no need for those debates if money were considered "property": Congress could simply spend money under its plenary power to "dispose of . . . Property belonging to the United States." U.S. Const. art. IV, § 3. Regardless, CS Lawn's challenge fails for the reasons explained below.

adjudication in a non-Article III tribunal, the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder." *Id.* at 345.

Whatever else public-rights cases might include, they unquestionably include Congress's "plenary power over immigration." *Jarkesy*, 144 S. Ct. at 2132–33 (recognizing that immigration and other "historic categories of adjudications fall within the" public-rights doctrine). The United States "has broad, undoubted power over the subject of immigration and the status of aliens," derived from both the Constitution and "its inherent power as sovereign to control and conduct relations with foreign nations." *Arizona v. United States*, 567 U.S. 387, 394 (2012). Immigration policy affects "trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws." *Id.* at 395. And "mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad." *Id.* That's why Congress's power to "regulate Commerce with foreign Nations" is "exclusive and plenary" and "comprehend[s] every species of commercial intercourse between the United States and foreign nations." U.S. Const. art. I, § 8; *Bd. of Trs. of Univ. of Ill. v. United States*, 289 U.S. 48, 56 (1933) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 193 (1824) (Marshall, C.J.)).

So the federal government need not allow employers to hire foreign workers *at all*. *See Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320, 334 (1909) (noting that "the authority of Congress over foreign commerce and its right to control the coming in of aliens into the United States" entitles Congress to "regulate that subject in the fullest degree"); *accord Jarkesy*, 144 S. Ct. at 2132–33. But it has chosen to do so with certain conditions. Specifically, Congress codified the temporary-foreign-worker program as part of the Immigration and Nationality Act of 1952 and refined it further in the Immigration Reform and Control Act of 1986. *See La. Forestry*, 745 F.3d at 659. The purpose of the 1986 Act was to "close the back door on illegal immigration so that the front door on legal immigration may remain open." *Noriega-Perez v. United States*, 179 F.3d 1166, 1170 (9th Cir. 1999) (quoting H.R. Rep. No. 99-682, at 46 (1986)). Because Congress "believed that '[e]mployment is the magnet that attracts aliens

10

here illegally,'" it prohibited employers from knowingly hiring "an unauthorized alien to work in the United States." *Id.* (citing 8 U.S.C. § 1324a). But it simultaneously refined the H-2B visa program, allowing "U.S. employers to recruit and hire temporary unskilled, non-agricultural workers from abroad to fill positions that no qualified U.S. worker will accept." *La. Forestry*, 745 F.3d at 659 (citing 8 U.S.C. § 1101(a)(15)(H)(ii)(b)). It makes no difference what agencies are tasked with implementing the H-2B program; it is through and through an exercise of Congress's foreign-commerce and immigration power. *Contra* Pl.'s Mot. at 26–27.

Perhaps unsurprisingly, the Supreme Court has long recognized that Congress may authorize the Executive Branch to administer immigration laws like the H-2B program and may impose money penalties for violations of those laws. Put simply, because "control of the admission of aliens is committed exclusively to Congress," in "the exercise of that control, it may lawfully impose appropriate obligations, sanction their enforcement by reasonable money penalties, and invest in administrative officials the power to impose and enforce them." *Lloyd Sabaudo Societa Anonima Per Azioni v. Elting*, 287 U.S. 329, 334 (1932); *Oceanic Steam*, 214 U.S. at 339 (same). The Supreme Court recently reiterated that conclusion in *Jarkesy*, explicitly distinguishing the securities laws at issue there from cases involving Congress's "plenary power over immigration" through which Congress can "prohibit immigration by certain classes of persons and enforce those prohibitions with administrative penalties assessed without a jury." 144 S. Ct. at 2132–33.

In other words, CS Lawn was able to hire foreign workers only "by grace of the other branches." *Stern*, 564 U.S. at 493 (citing *Murray's Lessee*, 59 U.S. (18 How.) at 284). The power "over immigration" is "inherently in the exclusive domain of the Federal Government and critical to its very existence." *Atlas Roofing Co. v. Occupational Safety and Health Rev. Comm'n*, 430 U.S. 442, 456 (1977) (explaining that adjudications involving immigration are "public rights [that] may be assigned to administrative agencies"); *Crowell v. Benson*, 285 U.S. 22, 51 (1932) (identifying "interstate and foreign commerce" and "immigration" as "[f]amiliar illustrations" of public-rights matters); *Oceanic Steam*, 214 U.S. at 334–35 ("Congress has

the power to exclude aliens from the United States," to "prescribe the terms and conditions on which they may come in," and to "commit the enforcement of such conditions and regulations to executive officers" without a jury.); *accord Jarkesy*, 144 S. Ct. at 2132–33.  So while the Supreme Court's recent decision in *Jarkesy* identified civil penalties for securities fraud as an issue that did not concern public rights, "*Jarkesy* clearly does not implicate immigration adjudication."[9]  *Elgebaly v. Garland*, 109 F.4th 426, 434, 437–38 (6th Cir. 2024).  For that reason, all Justices in *Jarkesy* reaffirmed that when Congress exercises its complete control over immigration, "administrative officers should have the authority to enforce designated penalties without resort to the courts."  *Jarkesy*, 144 S. Ct. at 2133 n.1 (quoting *Oceanic Steam*, 214 U.S. at 339).  Given "Congress's long-recognized and extensive authority over the field of immigration," it has been "traditionally included" within the core of public rights, *id.* at 2146, 2151 (Gorsuch, J., concurring), and a "civil-penalty statutory scheme" for immigration violations is "beyond all question constitutional," *id.* at 2160 (Sotomayor, J., dissenting).

To sidestep that result, Plaintiff claims that this case does not involve Congress's immigration power at all because "DOL imposed penalties on CS Lawn for" its H-2B violations "in Maryland—not because the workers crossed the border."  *Id.*  Pl.'s Mot. at 26–27.  But, again, the H-2B program is fundamentally an exercise of "the Government's sovereign authority to set the terms governing the admission and exclusion of noncitizens."  *Dep't of State*

---

[9] To the extent Plaintiff attempts to lean on an analogy to state contract law here, that does not change the analysis.  *See* Pl.'s Mot. at 19–20, 26–27.  The mere fact that a violation of immigration laws might be compared to a common-law claim does not place it outside of Congress' authority to regulate immigration or require Article III jurisdiction in the first instance.  Forgery may be likened to common-law claims but forging documents to demonstrate that a foreign national may legally work within the United States concerns "the public right to regulate immigration."  *Noriega-Perez*, 179 F.3d at 1177 (upholding civil penalties under 8 U.S.C. § 1324c).  Regulating the "unlawful employment of" noncitizens is "an important aspect of U.S. immigration law," and the courts have "long recognized that the power to exclude alien laborers" is a matter of "public rights."  *Id.*  So even when executive adjudication of immigration laws might seem to touch upon common-law issues—likes whether a noncitizen "did not enter her marriage in good faith"—such issues still concern adjudications of "public rights" that can "be conducted by the executive branch."  *Elgebaly*, 109 F.4th at 437.

*v. Muñoz*, 602 U.S. 899, 936 (2024). And it is a "fundamental proposition[]" that the United States' "plenary authority" over immigration includes the "concomitant" authority "to set the procedures to be followed" governing admission, regardless of whether the person is already "on U.S. soil." *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020). That's why one court bound by the Fifth Circuit's decision in *Jarkesy* (before the Supreme Court affirmed it) properly found that the Labor Department's adjudication of H-2 program violations "implicates public rights relating to immigration and labor law." *Frank's Nursery, LLC v. Walsh*, 2022 WL 2757373, at *8 (S.D. Tex. July 14, 2022). Indeed, CS Lawn does not dispute that the United States may impose civil penalties on noncitizens already in the country for immigration violations. *See, e.g.*, *Velasquez-Tabir v. INS*, 127 F.3d 456, 457–58 (5th Cir. 1997) (per curiam) (upholding civil penalty against foreign national who presented a falsified green card); *Remileh v. INS*, 101 F.3d 66, 67 (8th Cir. 1996) (per curiam) (similar). And the immigration laws apply equally to those who employ foreign nationals within the Nation's borders. *Villegas-Valenzuela v. INS*, 103 F.3d 805, 808 (9th Cir. 1996).

Consistent with that understanding, Congress has enacted many statutes that involve executive adjudication of immigration laws—including, where necessary, civil penalties—based on activities occurring within the Nation's borders. *See, e.g.*, 8 U.S.C. § 1188(g)(2) (Employers that fail to comply with the terms and conditions of employment under the H-2A visa program are subject to civil penalties and other remedies as may be necessary to ensure compliance); *id.* § 1182(n)(2)(C) (Employers petitioning the government to allow foreign nationals to work under an H-1B visa may not substantially fail to meet the required conditions, and penalties will be increased for willful misrepresentations.); *id.* § 1324a(a)(1)–(2), (e)(4) (Employers may not knowingly hire or continue to employ a noncitizen who is not authorized to work in the United States.); *id.* §§ 1183, 1183a(d) (Sponsors who support the admittance of foreign nationals under a "suitable and proper bond" must inform the Attorney General if they change address.); *id.* § 1288(c)(4)(E) (civil penalties for failure to meet or for misrepresenting requirements for noncitizens to perform longshore work at U.S. ports); *id.*

13

§ 1375a(d)(1), (5) (civil penalties for international marriage brokers who market to children). These enforcement measures are all exercises of the United States' sovereign authority to regulate lawful admission into the country and work by noncitizens. And they are therefore public rights that Congress can constitutionally assign "to executive officers," *Crowell*, 285 U.S. at 50, regardless of whether immigration violations occur at the border or within it, by noncitizens or by domestic employers of foreign workers.

### B.    CS Lawn impliedly consented to the Labor Department's adjudication.

Even if the Court were to break new ground and hold that the Labor Department's adjudication against CS Lawn ran afoul of Article III or the Seventh Amendment, Plaintiff's claim should still be dismissed because CS Lawn consented to executive adjudication. "[A]s a personal right, Article III's guarantee of an impartial and independent federal adjudication is subject to waiver, just as are other personal constitutional rights that dictate the procedures by which civil and criminal matters must be tried." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848–49 (1986). So non-Article III adjudicators may "decide claims submitted to them by consent" without "offend[ing] the separation of powers so long as Article III courts retain supervisory authority over the process." *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 678 (2015). Here, of course, federal courts retain supervisory authority over the Labor Department's adjudication: Plaintiff is in this Court challenging that adjudication under the APA. So the only question is whether CS Lawn consented to the agency's adjudication. It did.

While a litigant must "knowingly and voluntarily consent" to jurisdiction of a non-Article III tribunal, consent "may be express or implied." *Wellness Int'l*, 575 U.S. at 684–85. And a party may impliedly consent through its "actions rather than [its] words," including by litigating before a non-Article III tribunal without objection. *Id.* at 684. This implied-consent rule "increas[es] judicial efficiency and check[s] gamesmanship," preventing a litigant from "sandbagging" the court by "remaining silent about [their] objection and belatedly raising the error only if the case does not conclude in [its] favor." *Id.* at 685; *Stern*, 564 U.S. at 482.

14

That's exactly what happened here. When the Labor Department originally notified Plaintiff of its H-2B violations, it explained that CS Lawn had "the right to request a hearing," and any hearing request "must be made to and received by the Chief Administrative Law Judge" for administrative adjudication. AR 0002–03. CS Lawn timely requested "an evidentiary hearing before an Administrative Law Judge on" its H-2B violations, AR 0015, and then continued to litigate through the Labor Department for the next four years, never once objecting to the agency's non-Article III status or the lack of a jury trial. So this is not a case where "an objecting [party]" was "forced to litigate involuntarily before a non-Article III court." *Wellness Int'l*, 575 U.S. at 682–83. Instead, CS Lawn impliedly consented to non-Article III adjudication and has now—for the first time—lodged a (meritless) challenge in this Court. As one court explained in this context, a plaintiff "consent[s] to executive adjudication by litigating before the Administrative Law Judge and the Administrative Review Board without objection." *Frank's Nursery*, 2022 WL 2757373, at *8. CS Lawn's Seventh Amendment and Article III claims should therefore fail.

## II.    The Department of Labor's Administrative Law Judges do not violate the President's removal power.

### A.    CS Lawn forfeited its removal claims by failing to raise them with the agency.

The Court should not even consider Plaintiff's removal claims because it failed to raise them in the agency adjudication. "Administrative review schemes commonly require parties to give the agency an opportunity to address an issue before seeking judicial review of that question." *Carr v. Saul*, 593 U.S. 83, 88 (2021). And where the statute or regulations "establish[] a mandatory exhaustion requirement," courts have "no room to excuse a party's failure to exhaust." *Fleming v. U.S. Dep't of Agric.*, 987 F.3d 1093, 1098 (D.C. Cir. 2021). That's true here: the H-2B regulations explicitly require "[a]ny party desiring review of a determination [that they are liable for H-2B violations], including judicial review," to "make a request for [ ] an administrative hearing in writing," which must, among other things, "[s]tate the specific

reason or reasons why the party believes such determination is in error." 29 C.F.R. § 503.43. So Plaintiff needed to raise its removal claims with the agency first.

But even if the review scheme is considered "silent," courts decide "whether to require issue exhaustion based on an analogy to the rule that appellate courts will not consider arguments not raised before trial courts." *Carr*, 593 U.S. at 88. So in determining whether to impose an issue-exhaustion requirement, the Court must examine "the degree to which the analogy to normal adversarial litigation applies in a particular administrative proceeding." *Id.* (citation omitted). And here, the H-2B regulations require "formal adversarial adjudications." *See* 29 C.F.R. § 18.101; *id.* § 503.44 (noting that "29 CFR part 18 shall apply to administrative proceedings" for H-2B violations). As noted above, parties must initially "[s]tate the specific reason or reasons why the party believes [the agency's] determination is in error." *Id.* § 503.43. And after the case is referred to an ALJ, the ALJ does not look into issues on their own. Rather, the parties must identify contested issues, *see* 29 C.F.R. §§ 18.80(c), and the ALJ "has all powers necessary to conduct fair and impartial proceedings" between the parties, *id.* § 18.12(b); *id.* § 18.20. So "ex parte communications on the merits of a case with the judge" are prohibited. *Id.* § 18.14. Beyond that, the regulations are crystal clear that the agency is performing an adversarial adjudication driven by the parties, providing for extensive discovery procedures, motions practice, the equivalent of a bench trial (where the parties present evidence and testimony to the ALJ), and appeals. *See, e.g.*, *id.* § 18.50, *et seq.* (discovery procedures); *id.* § 18.70, *et seq.* (motion practice); *id.* § 18.80, *et seq.* (hearing procedures); 29 C.F.R. § 503.51 (appeals to the Review Board); s*ee also id.* § 18.10(a) ("The Federal Rules of Civil Procedure (FRCP) apply in any situation not provided for.").

At every step of this adversarial process, employers "bear the responsibility to develop issues for adjudicators' consideration," and thus issue exhaustion was required.[10] *Carr*, 593

---

[10] Given the plainly adversarial nature of the agency's adjudication, there is no need to examine any "additional considerations"—like the nature of the claims or futility—that might

U.S. at 89.  For all those reasons, one court recently and correctly held that "issue exhaustion [i]s required" in Labor Department adjudications because the plaintiff bears "the responsibility to develop issues for the adjudicator's consideration."  *Sun Valley*, 2023 WL 4784204, at *7.  By failing to raise its "Removal Power objections in the agency proceedings," CS Lawn's claims should likewise be "deemed forfeited."  *Id.*

### B.    CS Lawn has no viable removal claim because it cannot show any harm from the purported removal restrictions.

CS Lawn does not contend that the ALJ was unconstitutionally appointed here.  So the lack of any Appointments Clause problem also resolves any claim that the Labor Department's order of back wages and penalties should be set aside because "the ALJ here enjoyed an impermissible dual layer of for-cause protection from removal by the President."  Pl.'s Mot. at 27.  Even if there were a removal-power issue, "there is no reason to regard any of the actions taken by the" ALJ "as void" if he was "properly appointed."  *Collins*, 594 U.S. at 257–58.  In other words, "to void an agency action due to an unconstitutional removal protection, a party must show that the agency action would not have been taken *but for* the President's inability to remove" the relevant official.  *CFPB v. Law Offs. of Crystal Moroney, P.C.*, 63 F.4th 174, 180 (2d Cir. 2023); *Bhatti v. Fed. Hous. Fin. Agency*, 97 F.4th 556, 561 (8th Cir. 2024).  "Here, the ALJ lawfully exercised power that he possessed by virtue of his appointment," so "[a]bsent a showing of harm," the Court should "refuse to unwind the decisions below."  *Decker Coal Co, v. Pehringer*, 8 F.4th 1123, 1137 (9th Cir. 2021).

CS Lawn has not attempted to show any harm, nor could it.  As in other cases rejecting Plaintiff's theory, CS Lawn "has not asserted any possible harm resulting from the allegedly unconstitutional limitations on the President's ability to remove DOL ALJs" and "nothing in the record suggests" that the President or "the Secretary of Labor attempted or desired to

---

"tip the scales" against imposing an issue-exhaustion requirement.  *Carr*, 593 U.S. at 92; *id.* at 97 (Thomas, Gorsuch, Barrett, JJ., concurring) (finding that because Social Security "proceedings bear little resemblance to adversarial litigation," the analysis ends there).

remove" Judge Davis here. *K & R Contractors, LLC v. Keene*, 86 F.4th 135, 149 (4th Cir. 2023); *see Collins*, 594 U.S. at 260 (noting that harm might be shown if "the President had made a public statement expressing displeasure with actions taken by [the official at issue] and had asserted that he would remove the [official] if the statute did not stand in the way"). Put simply, the Court cannot "conclude that the existence of [removal restrictions] alone tainted the ALJ's decision."[11] *Decker Coal*, 8 F.4th at 1137. Indeed, if the Court accepted CS Lawn's argument—which hinges on a statute that prescribes removal for all federal ALJs—"it would have potentially catastrophic effects on numerous past and ongoing claim adjudications under various benefits programs administered throughout the federal government." *Id.* There is no reason to invite such "catastrophic effects" here, and Plaintiff's removal-power claim should be rejected.

### C.    The Department of Labor's ALJs are permissibly protected from removal.

Even if the Court reaches the merits of Plaintiff's removal-power claim, it should fail. Article II provides that "[t]he executive Power shall be vested in a President," who must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1; *id.* § 3. Because "[t]he entire 'executive Power' belongs to the President alone," the Supreme Court has found that executive "officers must remain accountable to the President, whose authority they wield." *Seila Law LLC v. CFPB*, 591 U.S. 197, 213–14 (2020). That accountability "generally includes

---

[11] Plaintiff attempts to avoid this conclusion by arguing that it need not make any showing of harm in APA cases because "*Collins v. Yellen*, 594 U.S. 220 (2021), does not displace the traditional APA remedy of vacatur." Pl.'s Mot. at 29 n.13. But, setting aside whether vacatur is the "traditional APA remedy," there is no reason to differentiate between APA remedies and other remedies. Even when a plaintiff raises "their constitutional claim under the APA, it would not change the analysis; the [plaintiff] would need to show they suffered an injury traceable to a Government *action* that violates the Constitution." *Collins*, 594 U.S. at 263 n.1 (Thomas, J., concurring). For that reason—as C.S. Lawn itself admits—courts have routinely held that "plaintiffs are entitled to vacatur only when they show specifically that the agency adjudication was somehow prejudiced by removal restrictions." Pl.'s Mot. at 29 n.13 (citing *K & R Contractors*, 86 F.4th at 149); *Bhatti*, 97 F.4th at 562.

the ability to remove executive officials, for it is only the authority that can remove such officials that they must fear and, in the performance of their functions, obey." *Id.* As another court recently held in this exact context, the removal protections for the Labor Department's ALJs do not run afoul of this principle. *See Sun Valley*, 2023 WL 4784204, at *8.

As "inferior [o]fficers," the Labor Department's ALJs were appointed by the Head[] of [their] Department[]," the Secretary of Labor. U.S. Const. art. II, § 2. And "the power of appointment to executive office carries with it, as a necessary incident, the power of removal." *Myers v. United States*, 272 U.S. 52, 126–27 (1926). That's why the Supreme Court has "sustained [ ] restrictions on the power of principal executive officers—themselves responsible to the President—to remove their own inferiors." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010); *United States v. Perkins*, 116 U.S. 483, 485 (1886) ("[W]hen congress, by law, vests the appointment of inferior officers in the heads of departments, it may limit and restrict the power of removal as it deems best for the public interest."). Where "only one level of protected tenure separate[s] the President from an officer exercising executive power," there is no removal problem because "[i]t [i]s the President—or a subordinate he c[an] remove at will—who decide[s] whether the officer's conduct merit[s] removal under the good-cause standard." *Free Enter. Fund*, 561 U.S. at 495. And that's exactly what we have here: ALJs may be removed by the Secretary of Labor—himself removable by the President at will—only for "good cause."[12] 5 U.S.C. § 7521(a).

---

[12] Contrary to Plaintiff's suggestion, *Free Enterprise Fund* does not control here. Pl.'s Mot. at 28; *Free Enter. Fund*, 561 U.S. at 507 n.10 (noting that the Court's holding does not apply to ALJs); *Decker Coal*, 8 F.4th at 1132 ("*Free Enterprise Fund* did not address the issue [of Labor Department ALJs] and its limited holding does not reach § 7521."). In that case, the Supreme Court held unconstitutional a statutory scheme where certain inferior officers could be removed only for good cause by principal officers that were themselves removable by the President only for "inefficiency, neglect of duty, or malfeasance in office." *Free Enter. Fund*, 561 U.S. at 496 (citation omitted). Here, in contrast, the Secretary of Labor—who may fire ALJs for good cause—is "subject to the President's direct control." *Id.* at 495.

It makes no difference that an ALJ may be removed "*by the agency in which the administrative law judge is employed* only for good cause established and determined by the Merit Systems Protection Board on the record after opportunity for hearing before the Board." *Id.* (emphasis added).  The Board does not rove around the federal government in search of ALJs to fire.  It is the "the agency in which the administrative law judge is employed" that decides to remove an ALJ for good cause; the Board is simply there to make sure that the agency properly invoked "good cause" for removal.  *Id.*  And it is nothing new that, after the "Head[] of [a] Department[]" decides to remove an inferior officer, his or her decision is independently examined.  Just as the Attorney General's decision to fire an "inferior officer" for good cause was allowable even though it was subject to judicial review, so too is the Secretary's decision to fire an ALJ for good cause allowable even though it is subject to the Merit Systems Protection Board's review.  *Morrison v. Olson*, 487 U.S. 654, 663–64, 686–93 (1988).  If anything, the President has *more* control over removal where, as here, the reviewers of a subordinate's firing decision are *also* removable by the President, rather than Article III judges who cannot be removed by the President at all.  *Compare Morrison*, 487 U.S. at 663–64, *with* 5 U.S.C. § 1202(d) (Merit Systems Protection Board members may be removed "by the President only for inefficiency, neglect of duty, or malfeasance in office").  Because ALJs are removable by the Secretary of Labor for good cause, nothing about Merit Systems Protection Board review transforms this into an impermissible removal scheme.

This is especially true when the Secretary need not use ALJs *at all*.  "No statute mandates that the [Labor Department] employ ALJs in adjudicating" H-2B assessments.  *Decker Coal*, 8 F.4th at 1133.  So there is no removal-power issue because "[t]he President has broad executive power to order the Secretary of Labor to change [the Labor Department]'s regulatory scheme and remove ALJs from the adjudicatory process."  *Id.* at 1134; *Sun Valley*, 2023 WL 4784204, at *9 (same).

For these reasons, one court rejected Plaintiff's exact argument in this exact context.  "When there is only one level of protected tenure separating the President from an officer,

there is no removal problem." *Sun Valley*, 2023 WL 4784204, at *8 (citing *Free Enter. Fund*, 561 U.S. at 495). And "[d]espite the Merit Systems Protection Board [ ] determining whether there is removal for 'good cause,' the action is taken by the agency which the administrative law judge is employed." *Id.* Because "the Secretary of Labor is removable by the President" and there is "only one level of protected tenure separating the President from an" ALJ, Plaintiff's removal-power claim should be dismissed. *Id.*

### III. The Department of Labor's imposition of back pay and penalties is in accordance with law and fully supported by the record.

On the merits, the Labor's Department's assessment of back wages was not arbitrary or capricious.[13] "Judicial review under that [arbitrary-or-capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "A court simply ensures that the agency" has "reasonably considered the relevant issues and reasonably explained the decision." *Id.* The ALJ's and Review Board's decisions here, spanning 55 pages, more than meet this standard. AR 6429 (ALJ Decision); AR 6664 (Review Board decision). The agency "reasonably considered" every aspect of CS Lawn's H-2B violations and "reasonably explained" its imposition of back wages, rejecting many of the same arguments CS Lawn raises again here. So the agency's determination should be upheld, and summary judgment entered for Defendants.

### A. The Labor Department properly enforced its 2008 H-2B regulations.

CS Lawn first claims that the Labor Department's 2008 regulations are no longer enforceable due to a permanent injunction issued in *Perez v. Perez*, No. 14-cv-682, ECF No. 14, slip op. at 7–8 (N.D. Fla. Mar. 4, 2015). *See* Pl.'s Mot. at 33–36. But CS Lawn submitted its application to the Labor Department and violated the H-2B requirements before the *Perez* injunction took effect in April 2015. So when the company raised this same argument with the agency, both the ALJ and the Review Board correctly rejected it. *See* AR 6668–69. That's

---

[13] Plaintiff does not contest the Review Board's decision ordering CS Lawn to pay $16,000 in civil money penalties for its violations of the H-2B program. So CS Lawn has waived any such challenge. *See Wood v. Milyard*, 566 U.S. 463, 474 (2012).

because the *Perez* court later clarified that "the permanent injunction was not intended to, and does not, apply retroactively." *Perez v. Perez*, No. 14-cv-682, ECF No. 62 (N.D. Fla. Sept. 4, 2015). Courts have therefore recognized that the Labor Department can enforce its 2008 H-2B regulations for pre-April 2015 labor certifications. In one case, for example, an H-2B employer sought sanctions against the Labor Department for violating the *Perez* injunction by continuing to enforce the 2008 Rule after the 2015 injunction. *See Drew's Lawn & Snow Serv., Inc.*, No. 18-cv-979, ECF No. 14 (N.D. Fla. Feb. 11, 2019). But the court—the same court that issued the *Perez* injunction—dismissed that case with prejudice, explaining that "the permanent injunction in *Perez* does not apply retroactively to prevent [the Labor Department] from enforcing the conditions of labor certifications issued under the 2008 Regulations prior to the entry of the injunction." *Id.* at 6.

The Review Board and ALJs have held the same. *See* AR 360 (ALJ holding that "the *Perez* injunction does not apply retroactively to preclude enforcement actions of labor certifications that were issued pursuant to the 2008 H-2B regulations prior to the injunction's effective date of April 30, 2015"); *Adm'r v. Strates Shows, Inc.*, ARB Case No. 15-069, Amended Final Decision & Order, slip op. at 2–3 (ARB Aug. 16, 2017) (reconsidering decision characterizing 2008 H-2B Rule as unenforceable and holding the same); *Adm'r, Wage & Hour Div. v. Guadagno*, ALJ No. 2016-LCA-00035, slip op. at 3–5 (ALJ June 12, 2017) (same); *Adm'r, Wage & Hour Div. v. St. Louis Select Landscaping, Inc.*, ALJ No. 2017-TNE-00003, slip op. at 5–6 (ALJ May 2, 2017) (same). So, in accordance with the *Perez* clarification, the Department still enforces compliance with the 2008 Rule for labor certifications issued under that rule before the *Perez* court's permanent injunction took effect in April 2015. And that fully applies to CS Lawn's certification in this case.

As a last-ditch effort to muddy the waters, Plaintiff raises two irrelevant regulations: the 2015 Rule that superseded the 2008 Rule and the 2012 Rule that never took effect. While Plaintiff seems to suggest that the Labor Department retroactively applied the 2015 Rule to

CS Lawn's conduct from 2012 to 2015, that argument is flat out wrong.[14]  *See* Pl.'s Mot. at 35–36.  It is true that the 2008 Rule was superseded by the 2015 Rule *going forward*.  *See* 29 C.F.R. § 503.1(d) (making clear that the 2015 Rule is prospective).  But this case involves only violations of the 2008 Rule, which is why the record clearly demonstrates that the Department applied the 2008 Rule here.  *See* AR at 0002; 6457.  For the same reason, it makes no difference whether the 2012 H-2B regulation was "invalid from the start."  Pl.'s Mot. at 34.  The 2012 Rule never went into effect because it was enjoined.  *Bayou Lawn v. Sec'y of Lab.*, 713 F.3d 1080 (11th Cir. 2013).  In any event, again, the 2012 Rule is not applicable here because CS Lawn's case is governed by the 2008 Rule.  And Plaintiff's attempts to argue that the 2008 Rule is unenforceable are incorrect.

## B.    The Labor Department is fully authorized to assess back wages.

Retreating to its backup argument, CS Lawn also contends that the agency's award of $38,000 in back wages should be vacated "because DOL lacked statutory authority to impose such a remedy."  Pl.'s Mot. at 36.  This fundamentally misconstrues the Secretary's authority.

If the Secretary of Labor finds "a substantial failure to meet any of the conditions of the petition to admit" a H-2B worker or "a willful misrepresentation of a material fact in such petition," the Secretary may "in addition to any other remedy authorized by law, impose such administrative remedies (including civil monetary penalties in an amount not to exceed $10,000 per violation) as the [Secretary] determines to be appropriate."  8 U.S.C. 1184(c)(14)(A)(i).[15]  True, the Secretary's authority "include[es]" the power to impose "civil money penalties."  Pl.'s Mot. at 36.  But the text is hardly so limited.  "Anyone fluent in the

---

[14] The Fourth Circuit has held that the Labor Department had authority to issue the 2015 Rule.  *See Outdoor Amusements Bus. Ass'n v. Dep't of Homeland Sec.*, 983 F.3d 671, 684–89 (4th Cir. 2020), *cert. denied,* 142 S. Ct. 425 (2021).

[15] Under 8 U.S.C. 1184(c)(14)(A)(i) and (B), effective in 2009, the Department of Homeland Security delegated to the Labor Department its investigative and enforcement authority, including the authority to impose administrative remedies and to assure compliance with the terms and conditions of the H-2B program.  *See* 2008 Rule, 73 Fed. Reg. at 78,046.

English language knows that the word 'includes' cannot be assumed to mean 'includes only.'" *Wnuck v. Comm'r*, 136 T.C. 498, 506 (T.C. 2011); *Apple Inc. v. Voip-Pal.com, Inc.*, 976 F.3d 1316, 1323 (Fed. Cir. 2020) (collecting cases); Include, Black's Law Dictionary (11th ed. 2019) ("The participle including typically indicates a partial list."). Congress left this authority open ended, specifically allowing the Secretary to "impose such administrative remedies . . . as the [Secretary] determines to be appropriate." 8 U.S.C. § 1184(c)(14)(A)(i). Nothing in this provision forecloses an award of back wages for improper deductions. *Contra* Pl.'s Mot. at 36–37. Another court recently rejected this same argument in the H-2A context. *Sun Valley*, 2023 WL 4784204, at *11 (explaining that "[n]othing in the statute prevents the agency from awarding back wages" because the "statute merely includes a list of some actions the Secretary of Labor is authorized to take"). And this Court should do the same here.

**C.    The Department of Labor's imposition of back pay is fully supported by the record and is neither arbitrary nor capricious.**

Plaintiff's last-ditch argument is that the agency improperly awarded back wages based on the facts here. Specifically, Plaintiff contests only two aspects of the agency's adjudication concerning CS Lawn's improper deductions for housing and uniforms: (1) back wages were allegedly improper because CS Lawn "paid its employees the wages they were owed" and "accurately disclosed the deductions to the workers," Pl.'s Mot. 37–38; and (2) the back wage award was allegedly "not in accordance with DOL's own regulations" because it was not recovering "unpaid wages" or "make whole relief," Pl.'s Mot. at 38–39. Both arguments fail. For all these back wages, the agency "reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio*, 592 U.S. at 423. Even though the agency's thorough rulings would satisfy a higher standard, the APA requires nothing more.

**1.    CS Lawn made improper deductions from worker's pay for housing and uniforms.**

Despite Plaintiff's contention that it "paid its employees the wages they were owed" and "accurately disclosed deductions to the workers," Plaintiff failed to meet the requirements

of the H-2B regulations that prohibit improper deductions from H-2B worker's pay. The Review Board therefore correctly affirmed the ALJ's award of back pay for the improper housing and uniform deductions.

As to the improper deductions for housing, the H-2B regulations require that all deductions an employer makes from an H-2B worker's pay must be reasonable and, for employers covered by the Fair Labor Standards Act, the deductions may not violate the FLSA. *See* 20 C.F.R. 655.22(g)(1). Plaintiff does not dispute that it is covered by the FLSA. And, under that statute, an employer may not charge for the cost of lodging where the facilities are furnished in violation of any "Federal, State, or local law, ordinance or prohibition." 29 C.F.R. § 531.31. Here, the ALJ found, and the Review Board correctly affirmed, that the housing CS Lawn provided to some of its H-2B workers could not be used as residential living quarters under local ordinances. AR 6465, 6676. Specifically, during the relevant periods, 1107 Butterworth Court was zoned as "suburban industrial." AR 6676. So Queen Anne's County zoning ordinances prohibited use of this location for residential purposes. *Id.* Unsurprisingly, Plaintiff does not dispute that the housing it provided (and for which it deducted rent) violated local law. The Review Board therefore correctly concluded that "the housing was not 'customarily furnished' pursuant to Section 531.31 of the FLSA," and CS Lawn "in turn violated Section 655.22(g)(1)" by deducting rent for such housing. AR 6676.

Plaintiff's argument that the Labor Department does not have "the broader power to police local zoning violations" is beside the point. Pl.'s Mot. at 38–39. The Department did not cite CS Lawn for its local zoning violation; it cited CS Lawn for its violation of the Department's regulation, which explicitly prohibits FLSA-covered employers making deductions that violate the FLSA. *See* 20 C.F.R. § 655.22(g)(1). And because the FLSA prohibits charging for lodging that violates local law, *see* 29 C.F.R. § 531.31, CS Lawn made improper deductions for illegal housing.

As to the improper deductions for uniforms, the H-2B regulations provide that "the job offer must specify all deductions not required by law that the employer will make from

the worker's paycheck." 29 C.F.R. § 655.22(g)(1). Based on the testimony of Plaintiff's own-ers, the record reveals that CS Lawn told H-2B workers that they would be charged $13.66 per pay period for uniforms. AR 6464. But Plaintiff actually charged the workers $18.62 per pay period for the uniforms. *Id.* So the ALJ properly concluded, and the Review Board correctly affirmed, that Plaintiff violated the deduction-disclosure requirement and owed each of the 21 H-2B workers in the 2015 season $99.20—the difference between the disclosed de-duction and the charged deduction—for a total of $2,083.20. AR 6464, 6675, 6677–78.

While CS Lawn thinks there was no violation because it allegedly disclosed the full uniform deduction upon the workers' arrival, Pl.'s Mot. at 38, that is incorrect. The regulation mandates that an employer's "*job offer* must specify all deductions not required by law that the employer will make from the worker's paycheck." *See* 20 C.F.R. § 655.22(g)(1) (emphasis added). And the term "job offer" refers to the employer's *proposed* terms and conditions of employment during the labor certification process, not what is disclosed to workers upon their arrival. *See, e.g.*, 2008 Rule, 73 Fed. Reg. 78020 ("The SWA reviews the employer's applica-tion and job offer (comparing the employer's offered wage against the prevailing wage for the position)…); *id.* at 78032 ("Changes in the terms of employment contained in the underlying job offer will trigger a requirement for a new labor market test."). As the Review Board cor-rectly explained, the term "job offer" focuses "on what the employer disclosed to the potential employees prior to hiring them, not what employees were informed of upon arrival." AR 6675. So disclosure of the uniform deduction on the day that H-2B workers arrived does not satisfy the regulation's deduction-disclosure requirement. *See* 20 C.F.R. § 655.22(g)(1).

### 2. The award of back wages was fully in line with the Labor Depart-ment's regulations.

Plaintiff lastly rails against the back-wage award for its unlawful housing and uniform deductions by arguing that "DOL's own regulations" "limit DOL's recovery to 'unpaid wages' or 'make whole relief.'" Pl. Mot. at 38 (citing 20 C.F.R. § 503.20). But Plaintiff no-tably leaves out the portion of the Department's regulations providing that the Administrator

may seek "recovery of unpaid wages," including "recovery of prohibited recruitment fees paid *or impermissible deductions of pay*."  20 C.F.R. § 503.20(a) (emphasis added); *see also Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1236 (11th Cir. 2002) (finding "no legal difference between deducting a cost directly from the worker's wages and shifting a cost, which they could not deduct, for the employee to bear").  So, contrary to Plaintiff's contention, it is abundantly clear from the regulations that the Administrator may seek to recover impermissible deductions of pay, like those at issue here.

In the same vein, CS Lawn argues that the award of back wages for the unlawful deductions is improper because it constitutes a "windfall" and is not "make whole relief."  Pl.'s Mot. at 38.  But the backpay award here is, in fact, "make whole relief": it simply returns the amount of the illegal deductions necessary to raise the 21 workers' wages to the required minimum they were due.  *See* AR 6677 (holding that the ALJ's order to reimburse workers for the entire amount of" the improper housing and uniform "deductions is a legally appropriate remedy").  Far from being arbitrary or capricious, the agency "reasonably considered the relevant issues and reasonably explained the decision."  *Prometheus Radio*, 592 U.S. at 423.

## IV.  The Labor Department did not violate the Excessive Fines Clause.

Finally, Plaintiff's excessive-fines claim fails.  Pl.'s Mot. at 30–33.  The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  "Taken together, these Clauses place 'parallel limitations' on 'the power of those entrusted with the criminal-law function of government.'"  *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019).  But because the agency's award of penalties was reasonable and easily survives APA review, it necessarily does not violate the Excessive Fines Clause.  *See Pharaon v. Bd. of Governors of Fed. Rsrv. Sys.*, 135 F.3d 148, 157 (D.C. Cir. 1998).  In any event, if the Court dives deeper into the analysis, the threshold question here is to determine "whether the Excessive Fines Clause applies."  *United States v. Bikundi*, 926 F.3d 761, 795 (D.C. Cir. 2019).  If so, the Court then determines "if the Clause was violated" by "assessing whether the extraction was excessive."  *Id.*  Here,

the Excessive Fines Clause does not apply and, even if it did, the "fine" at issue easily satisfies the Constitution.

Setting aside whether the Excessive Fines Clause applies to corporations at all,[16] there is no "fine" here. "[A]t the time the Constitution was adopted, 'the word "fine" was understood to mean a payment to a sovereign as punishment for some offense.'" *United States v. Bajakajian*, 524 U.S. 321, 328 (1998). "Then, as now," fines were typically imposed as punishments in criminal prosecutions. *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265 (1989). And while the Supreme Court has found certain civil penalties and forfeitures to be "punishment" within the scope of the Excessive Fines Clause, it has only done so in cases where the penalty or forfeiture was either a post-conviction sanction or was assessed against property used in the commission of a crime for which the owner had already been convicted. *See Bajakajian*, 524 U.S. at 325 (federal statute that provides that a person convicted of willfully violating reporting requirement shall forfeit any property "involved in such offense"); *Austin v. United States*, 509 U.S. 602, 622 (1993) (federal statute that makes property used to facilitate drug crimes subject to civil *in rem* forfeiture). The Court has never characterized an exaction with no connection to either criminal activity or a criminal proceeding as "punishment for some offense." *Bajakajian*, 524 U.S. at 328. For that reason, one circuit has explicitly held that civil penalties unconnected from criminal sanctions are not covered by the Excessive Fines Clause. *See United States v. Toth*, 33 F.4th 1, 16 (1st Cir. 2022), *cert. denied*, 143 S. Ct. 552 (2023). Indeed, many of the factors that indicate if a fine is "excessive" make little sense when a fine is completely divorced from any criminal proceeding. *See*

---

[16] It is an open question whether the Excessive Fines Clause applies to corporations. *See Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 276 n.22 (1989); *United States v. Chaplin's, Inc.*, 646 F.3d 846, 851 n.15 (11th Cir. 2011); *see also, e.g.*, *United States v. Pilgrim Mkt. Corp.*, 944 F.2d 14, 22 (1st Cir. 1991) (describing the "very tenuous assumption" that "the eighth amendment proscription against excessive fines applies to corporations"); *Colorado Dep't of Lab. & Emp. v. Dami Hosp., LLC*, 442 P.3d 94, 100 (Colo. 2019) (concluding that the Excessive Fines Clause applies to corporations).

*Bikundi*, 926 F.3d at 795 (examining the "essence of the crime" and the "maximum sentence and fine that could have been imposed"). So the Clause does not apply to the $16,000 in civil penalties here.[17] *See* Compl. ¶ 86.

Regardless, those civil penalties are far from "excessive."[18] To be unconstitutionally excessive, the fine must be "grossly disproportional to the gravity of a defendant's offense." *Bikundi*, 926 F.3d at 795. One court recently rejected a similar argument that the Labor Department's imposition of $211,800 in H-2A penalties violates the Excessive Fines Clause. *Sun Valley*, 2023 WL 4784204, at *3, 11. This Court should follow the same analysis and hold that the penalties at issue here—a small fraction of the amount upheld in *Sun Valley*—easily passes constitutional muster.

Here, as in *Sun Valley*, CS Lawn's "violations harmed the workers' reliance and overall integrity of the" H-2B program. *Sun Valley*, 2023 WL 4784204, at *11. And while the improper housing deductions were not catastrophic, the ALJ described the "gravity of the violations" as "moderate," explaining that the "improper housing deduction had an impact on several" of the H-2B workers. AR 6466. And despite Plaintiff's protestations, CS Lawn is in the heartland of "persons for whom the statute was principally designed" to punish: companies that employ temporary foreign workers but violate the terms of the H-2B program. *Bikundi*, 926 F.3d at 795. While Plaintiff notes that "Congress reserved the harshest penalties for violations harming U.S. workers," Pl.'s Mot. at 32, that's exactly what occurred here. As

---

[17] While CS Lawn was ordered to pay $16,000 in total penalties, Plaintiff's briefing focuses on the mere $7,500 in penalties imposed for the improper housing deductions. *Compare* Pl.'s Mot. at 30–33, *with* AR 6467.

[18] CS Lawn is incorrect that back wages should be considered in the excessive-fines analysis. Pl.'s Mot. at 30. Plaintiff itself cites numerous cases indicating that back pay is not a punishment but is instead "in the nature of compensatory damages." *Id.* at 16–18 (collecting cases). That's why one court recently analyzed this issue and looked only at penalties, not back wages. *See Sun Valley*, 2023 WL 4784204, at *11. Even if the Court considered back wages, however, it would not impact the analysis because the agency's backpay award was reasonable and directly linked to CS Lawn's violations.

the ALJ explained about CS Lawn's penalties more broadly, the company's "failure to offer the same terms and conditions as those offered to H-2B workers had an impact on an undetermined number of potential U.S. workers in 2013 and 2014 who may have applied for jobs if they had been provided accurate wage information." AR 6466.

Most importantly, here, as in *Sun Valley*, the agency imposed far less than the maximum penalty. *Sun Valley*, 2023 WL 4784204, at *11. As Plaintiff acknowledges, "the maximum statutory penalty is $10,000 per violation." Pl.'s Mot. at 32. Yet CS Lawn has been charged only $2,500 for each of the three improper housing deductions. *See* AR 6466. In fact, although the Administrator originally charged CS Lawn with $75,000 in penalties, the ALJ reduced it to $21,000 and the Review Board ultimately reduced it to $16,000. *See* AR 6466; AR 6667; AR 6679. In doing so, the ALJ and the Review Board explicitly considered, among other things, the fact that CS Lawn had not "previously violated provisions of the H-2B program" and had "made a good faith effort to comply with the program requirements" without "deliberately attempt[ing] 'to game the system' for its own pecuniary advantage." AR 6667. Just as in *Sun Valley*, "[s]uch reduction" is "not grossly disproportionate to [CS Lawn's] offenses when the sum is less than legally permissible." *Sun Valley*, 2023 WL 4784204, at *11.

And, as in *Sun Valley*, the penalties here were "nothing out of the ordinary." *Id.* According to Plaintiff itself, "[f]rom 2011 through April 2023, for alleged violations of the H-2B program, DOL has imposed more than $200,000 in civil monetary penalties against an employer on two occasions; between $100,000 and $200,000 on 14 occasions; between $10,000 and $100,000 on 365 occasions; and under $10,000 on 279 occasions." Compl. ¶ 40.

So if Sun Valley's $211,800 in penalties doesn't violate the Excessive Fines Clause for all these reasons, it's difficult to see how CS Lawn's $16,000 in penalties could. Plaintiff's excessive-fines claim should be rejected and judgment should be entered for Defendants.

## CONCLUSION

For the reasons explained above, Plaintiff's summary-judgment motion should be denied and Defendants' summary-judgment motion should be granted.

DATED:  December 16, 2024                    Respectfully submitted,

                                             BRIAN M. BOYNTON
                                             Principal Deputy Assistant Attorney General

                                             JULIE STRAUS HARRIS
                                             Assistant Director, Federal Programs Branch

                                             */s/ Stephen Ehrlich*
                                             STEPHEN EHRLICH
                                             Attorney
                                             U.S. Department of Justice
                                             Civil Division, Federal Programs Branch
                                             Peter W. Rodino, Jr. Federal Building
                                             970 Broad Street, 7th Floor
                                             Newark, NJ 07102
                                             Phone: (202) 305-9803
                                             Email: stephen.ehrlich@usdoj.gov

                                             *Attorneys for Defendants*