**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

C.S. LAWN & LANDSCAPE, INC.,

        Plaintiff,

        v.                                                                          Case No. 23-cv-1533 (TSC)

U.S. DEPARTMENT OF LABOR, *et al.*,

        Defendants.

**MEMORANDUM OPINION**

        Plaintiff C.S. Lawn & Landscape sues the Department of Labor ("DOL") and Lori Chavez-DeRemer in her capacity as United States Secretary of Labor, challenging DOL's administration and enforcement of the H-2B temporary foreign worker visa program.[1]  Plaintiff contends that the agency's assessment of back wages and civil monetary penalties stemming from alleged violations of H-2B program conditions violated the separation of powers under Articles II and III, the Seventh Amendment's jury trial guarantee, the Eighth Amendment's prohibition on excessive fines, and the Administrative Procedure Act ("APA").  Plaintiff moves for summary judgment on these grounds, ECF No. 16, and Defendants cross-move for summary judgment, ECF No. 19.  For the reasons that follow, the court will GRANT Defendants' cross-motion for summary judgment and DENY Plaintiff's motion for summary judgment.

---

[1] Secretary Chavez-DeRemer is automatically substituted for former Acting Secretary of Labor Julie Su.  *See* Fed. R. Civ. P. 25(d).

## I.    BACKGROUND

### A.    Statutory Background

The Immigration and Nationality Act ("INA") of 1952 "established the modern framework for regulation of immigration in the United States, including provisions for the admission of permanent and temporary foreign workers." *La. Forestry Ass'n v. Dep't of Lab.*, 745 F.3d 653, 659 (3d Cir. 2014).  In 1986, Congress amended the INA to provide for two separate programs to regulate the employment of temporary foreign workers: the H-2A program for agricultural workers and the H-2B program for non-agricultural workers.  *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(a)–(b). "Named for the statutory section under which it was created, the H-2B program permits U.S. employers to recruit and hire temporary unskilled, non-agricultural workers from abroad to fill positions that no qualified U.S. worker will accept." *La. Forestry*, 745 F.3d at 659; *see* 8 U.S.C. § 1101(a)(15)(H)(ii)(b).

Congress originally vested authority for implementation of the INA in the Attorney General and directed the Attorney General to consult with other government agencies when considering applications for admission of H-2B workers.  *See* 8 U.S.C. §§ 1184(a)(1), (c)(1).  In 2002, Congress transferred this authority to the Secretary of the Department of Homeland Security ("DHS"), again requiring "consultation with appropriate agencies of the Government, upon petition of the importing employer." *Id.* § 1184(c)(1); *see* 6 U.S.C. §§ 202, 557.  DHS has designated DOL as its consulting agency, requiring employers to first apply for a "temporary labor certification from the Secretary of Labor stating that qualified workers in the United States are not available and that the alien's employment will not adversely affect wages and working conditions of similarly employed United States workers."  8 C.F.R. § 214.2(h)(6)(iv)(A).

In 2008, DOL promulgated, through notice and comment rulemaking, a regulation governing the labor certification process. *See* 73 Fed. Reg. 78,020 (2008); 20 C.F.R. pts. 655–56 (2008).[2]  Under the 2008 regulation, a prospective employer must obtain a prevailing wage determination from DOL, 20 C.F.R. § 655.10, advertise and attempt to recruit U.S. workers at the prevailing wage or higher, *id.* §§ 655.15, 655.17, and, if unsuccessful, may submit an Application for Temporary Employment Certification accompanied by a recruitment report, *id.* § 655.20.  As part of this process, the employer must submit a "job order" to DOL, specifying the number of workers sought, the services to be performed, work hours and days, the geographic area of employment, the wage or wage range, available employer-provided facilities, and all pay deductions.  *Id.* §§ 655.15(a), 655.18(b)(2)–(5), (10)–(11).  The terms set forth in the job order constitute both the H-2B worker's employment contract and the minimum terms that must be advertised to U.S. workers.  *See id.* §§ 655.18(a)(1), 655.20; 29 C.F.R. § 503.16(a).

An employer must also attest that it will abide by all the conditions set forth in 20 C.F.R. § 655.22(a)–(n), including that terms offered to U.S. workers are "not less favorable than those offered to the H-2B worker(s)," *id.* § 655.22(a); that "the job offer must specify all deductions . . . from the worker's paycheck," *id.* § 655.22(g)(1); that all such deductions are "reasonable" and abide by the Fair Labor Standards Act ("FLSA"), where applicable, *id.*; and that the application accurately states the "number of positions being requested for labor certification," *id.* § 655.22(n). The employer must certify under penalty of perjury that all information in its application is true and accurate and that it agrees to abide by the terms and obligations of the H-2B program.  *See id.* § 655.65(f).

---

[2] All subsequent citations to 20 C.F.R. parts 655–56 refer to the 2008 version of those regulations.  *See* 73 Fed. Reg. 78,020 (Dec. 19, 2008).

Once DOL issues the labor certification, the prospective employer may file an H-2B visa application with DHS.  *See* 8 C.F.R. § 214.2(h)(6)(iii)(C), (E).  This certification constitutes "advice to the [United States Citizenship and Immigration Services] director on whether or not United States workers capable of performing the temporary services or labor are available and whether or not the alien's employment will adversely affect the wages and working conditions of similarly employed United States workers." *Id.* § 214.2(h)(6)(iii)(A).  "Although the DOL's labor certification is a prerequisite to obtaining an H-2B visa petition, the authority to grant or deny an H-2B visa petition ultimately rests with the DHS alone." *La. Forestry*, 745 F.3d at 661; *see* 8 U.S.C. § 1184(c).

Effective in 2009, DHS delegated its investigative and enforcement authority over the H-2B program to DOL.  *See* 8 C.F.R. § 214.2(h)(6)(ix).  This authority includes the power to impose, "after notice and an opportunity for a hearing," administrative remedies for "a substantial failure to meet any of the conditions of the petition . . . or a willful misrepresentation of a material fact in such petition."  8 U.S.C. § 1184(c)(14)(A)(i); *see id.* § 1184(c)(14)(B) (permitting delegation "to the Secretary of Labor . . . any of the authority given to the Secretary of Homeland Security under subparagraph (A)(i)").  After conducting an investigation, DOL's Wage and Hour Division Administrator ("Administrator") may exercise its delegated authority to "impose . . . administrative remedies" as "appropriate," including "civil monetary penalties in an amount not to exceed $10,000 per violation," *id.* § 1184(c)(14)(A)(i), and back wages, 20 C.F.R. § 655.65(i).  An employer may contest the Administrator's decision by requesting a hearing before an Administrative Law Judge ("ALJ").  *See* 29 C.F.R. § 503.43(a).  After the ALJ conducts a hearing on the record and reaches a decision, *id.* §§ 503.43–503.50, either party may appeal the ALJ's decision to the Administrative Review Board ("ARB"), *id.* §§ 503.51(a), 503.55.  Either party may

then seek judicial review of the ARB's final order in federal district court under the APA. *See* 5 U.S.C. § 706(2).

**B.       Factual Background and Procedural History**

Plaintiff is a small residential and commercial landscaping company in Kent Island and Annapolis, Maryland that has participated in the H-2B program for over two decades. AR 6298–6301, 6665. In February 2015, a Wage and Hour Division investigator responded to a complaint that Plaintiff had underpaid workers, AR 6436, and in February 2018, the Administrator issued a determination letter finding "a substantial failure to comply with the recruitment and hiring of U.S. workers, unfavorable terms and working conditions, impermissible pay deductions, and a willful misrepresentation of a material fact regarding the accuracy of its need for temporary workers" in the 2013, 2014, and 2015 seasons. AR 6665–66; *see* 20 C.F.R. §§ 655.22(a), (g)(1), (n).

Plaintiff timely requested an ALJ hearing, AR 15–19, and in September 2019, the ALJ issued a decision finding that Plaintiff (1) offered prospective U.S. workers less favorable terms than it did some of its H-2B workers, AR 6666; (2) inflated the requested number of H-2B workers by two, *id.*; (3) deducted more for uniforms and laundry services than disclosed in the job offer, AR 6667; and (4) violated local zoning law by housing H-2B workers in an area zoned for "suburban industrial," not residential use, *id.* The ALJ ordered Plaintiff to pay $36,000 in back wages for the housing deductions, $2,083 in back wages for the uniform deductions, and $21,000 in civil penalties. AR 6467. Plaintiff appealed to the ARB, which affirmed the ALJ but reduced civil penalties to $16,000. AR 6677–79. Plaintiff then filed this lawsuit in May 2023, challenging the ARB's decision on constitutional and statutory grounds. *See* Compl. ¶¶ 87–131.

## II.    LEGAL STANDARD

The APA authorizes judicial review of final agency action and instructs a reviewing court to set aside such action if it finds it to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A)–(C).  The arbitrary-and-capricious standard is "highly deferential" and "presumes the agency's action to be valid."  *Env't Def. Fund Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981).  A court will not disturb an agency determination if the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962)).

While the APA mandates deferential review of agency policymaking and factfinding, courts employ "no deferential standard" in answering "legal questions."  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024).  Instead, the APA requires courts to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority."  *Id.* at 412.  "When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits."  *Id.* at 395.  "The court fulfills that role by recognizing constitutional delegations, fixing the boundaries of the delegated

authority, and ensuring the agency has engaged in reasoned decisionmaking within those boundaries." *Id.* (cleaned up).

"In APA cases such as this one, involving cross-motions for summary judgment, 'the district judge sits as an appellate tribunal'" and the ""'entire case" on review is a question of law.'" *Kondapally v. U.S. Citizenship & Immigr. Servs.*, 557 F. Supp. 3d 10, 20 (D.D.C. 2021) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).  The court must decide, as a matter of law, "whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Coe v. McHugh*, 968 F. Supp. 2d 237, 240 (D.D.C. 2013).

### III.    ANALYSIS

Plaintiff asserts that DOL's administrative adjudication in this case violated Article III and the Seventh Amendment's jury trial right and that the ALJ was impermissibly insulated from removal under Article II.  Plaintiff further claims that DOL lacked authority to promulgate the 2008 regulations and award back wages, and that the agency's award of housing-related back wages constituted an excessive fine under the Eighth Amendment.  The court addresses and rejects each of these challenges below.

### A.    Article III and Seventh Amendment Challenges

Article III vests "[t]he judicial Power of the United States . . . in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1.  The Seventh Amendment guarantees that "[i]n suits at common law, . . . the right of trial by jury shall be preserved." U.S. Const. amend. VII.  To determine whether a claim may be adjudicated in an administrative forum without a jury under Article III and the Seventh Amendment, courts apply a two-part analysis.  First, the court must determine the "threshold issue"

of "whether th[e] action implicates the Seventh Amendment" because of the common-law nature of the cause of action and remedy. *SEC v. Jarkesy*, 603 U.S. 109, 120 (2024); *see id.* at 122–23. Second, the court must consider whether the "public rights" exception applies—that is, whether the action concerns rights that "'historically could have been determined exclusively by [the executive and legislative]' branches" or that "can be pursued only by grace of the other branches." *Stern v. Marshall*, 564 U.S. 462, 493 (2011) (quoting *N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 68 (1982)). If the public rights exception applies, Congress may "assign [a] matter for decision to an agency without a jury," even if it implicates the Seventh Amendment. *Jarkesy*, 603 U.S. at 127.

The Supreme Court recently reiterated that immigration is among the "historic categories of adjudications [that] fall within the [public rights] exception." *Id.* at 129–30; *see Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 451 (1977) ("Congress has entrusted to an administrative agency the task of adjudicating violations of the customs and immigration laws and assessing penalties based thereon."). Congress's power over immigration is "broad" and derives from both the Constitution and the federal government's "inherent power as sovereign to control and conduct relations with foreign nations." *Arizona v. United States*, 567 U.S. 387, 394–95 (2012). This sovereign power reflects the reality that "[i]mmigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws." *Id.* at 395.

"Pursuant to its plenary power over immigration," Congress has long "excluded immigration by aliens." *Jarkesy*, 603 U.S. at 129. In exercising "control of the admission of aliens," Congress "may lawfully impose appropriate obligations, sanction their enforcement by

reasonable money penalties, and invest in administrative officials the power to impose and enforce them." *Lloyd Sabaudo Societa Anonima per Azioni v. Elting*, 287 U.S. 329, 334 (1932). It follows that Congress may "prohibit immigration by certain classes of persons and enforce those prohibitions with administrative penalties assessed without a jury." *Jarkesy*, 603 U.S. at 129; *see Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339–40 (1909).

The H-2 program fits squarely within this authority. In refining the H-2 program in the Immigration Reform and Control Act of 1986, Congress sought to "close the back door on illegal immigration so that the front door on legal immigration may remain open," *Noriega-Perez v. United States*, 179 F.3d 1166, 1170 (9th Cir. 1999), while protecting U.S. workers by allowing "employers to recruit and hire temporary unskilled, non-agricultural workers from abroad to fill positions that no qualified U.S. worker will accept," *La. Forestry*, 745 F.3d at 659. The H-2B program is a direct exercise of Congress's "power to . . . prescribe the terms and conditions on which [noncitizens] may come in" to the United States "and to commit the enforcement of such conditions and regulations to executive officers." *Oceanic Steam*, 214 U.S. at 335 (quoting *U.S. ex rel. Turner v. Williams*, 194 U.S. 279, 289–90 (1904)).

The administrative enforcement mechanism that backstops those conditions is inseparable from that sovereign power. The obligations at issue—to offer U.S. workers terms no less favorable than H-2B workers, to accurately represent the number of positions, to properly disclose and limit payroll deductions, and to provide housing meeting applicable codes—exist not to enforce a private bargain between the employer and worker, but to effectuate the INA's careful balance of addressing labor shortages with adequate protection for American workers. *See* 20 C.F.R. §§ 655.22(a), (g)(1), (n). They protect the integrity of the admissions process by ensuring that U.S. workers receive accurate wage information, certifications reflect genuine labor need, and admitted

workers are not exploited once here. *See id.* These objectives directly further Congress's purpose in creating the H-2B classification: to allow entry of noncitizen workers on a temporary basis to meet labor needs, but only "if unemployed persons capable of performing such service or labor cannot be found in this country." 8 U.S.C. § 1101(a)(15)(H)(ii)(b).

Further, Plaintiff's ability to hire foreign workers through the H-2B program is "a matter that can be pursued only by grace of the other branches." *Stern*, 564 U.S. at 493. Participation in the H-2B program is not a preexisting right, but a benefit created by Congress that is only available through compliance with the program's conditions. As another court in this district recently determined in a similar case involving H-2B program violations, "the question is not whether an employer fulfilled promises made to its foreign workers, . . . but whether the employer was qualified to bring foreign workers into the U.S. *at all*." *Butler Amusements, Inc. v. Dep't of Lab.*, No. 24-1042, 2025 WL 2457687, at *7 (D.D.C. Aug. 26, 2025) (holding that public rights exception applied to H-2B enforcement action seeking back wages and civil monetary penalty for job-classification misrepresentations).

In sum, the "substance of the suit" is the administration and enforcement of a congressionally prescribed immigration program. *Jarkesy*, 603 U.S. at 135. The "object" of DOL's enforcement is not "to regulate transactions between private individuals interacting in a pre-existing market," *id.*, but to ensure that the conditions for temporary admission of noncitizens to fulfill unmet labor needs are satisfied. Because the court determines that DOL's adjudication of Plaintiff's H-2B violations falls squarely within the public rights exception, the Seventh Amendment poses no barrier to such adjudication.

Even if the court were to agree that Plaintiff was unlawfully deprived of jury factfinding, by litigating for several years before DOL without raising any constitutional objection, Plaintiff

has impliedly consented to agency adjudication and thus waived any such right. "The entitlement to an Article III adjudicator is a personal right and thus ordinarily subject to waiver." *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 678 (2015) (cleaned up). "[A]llowing Article I adjudicators to decide claims submitted to them by consent does not offend the separation of powers so long as Article III courts retain supervisory authority over the process." *Id.* A party may impliedly consent through its "'actions rather than words,'" including by litigating before a non-Article III tribunal without objection. *Id.* at 684 (quoting *Roell v. Withrow*, 538 U.S. 580, 589 (2003)). "[T]he key inquiry is whether 'the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case' before the non-Article III adjudicator." *Id.* at 685 (quoting *Roell*, 538 U.S. at 590).

"Plaintiff . . . was made aware of the need to consent to agency adjudication by choosing to participate in the voluntary H-2B visa program—a comprehensive statutory and regulatory immigration program with regulations that provide a detailed enforcement mechanism wherein violations of the program would be initially adjudicated by a non-Article III decisionmaker and ultimately subject to an Article III court's review via an appeal of the Administrative [Review] Board's decision." *Butler Amusements*, 2025 WL 2457687, at *8. "Plaintiff also had the right to refuse such adjudication by either not participating in the voluntary H-2B visa program or participating in the program and objecting to the agency's adjudication during [four] years of litigation." *Id.* Because Plaintiff chose to participate in the H-2B program with full knowledge of agency adjudication procedures and not only failed to object during the ALJ proceedings but actively invoked the agency's process by requesting a hearing, engaging in extensive discovery, and briefing the merits through the ARB, Plaintiff impliedly consented to agency adjudication.

*See Frank's Nursery, LLC v. Walsh*, No. H-21-3485, 2022 WL 2757373, at *8 (S.D. Tex. July 14, 2022).

**B.      Article II Challenge**

Plaintiff next claims that vacatur of DOL's entire award is warranted because the ALJ enjoyed multiple layers of for-cause removal protections, in violation of Article II.  *See* Pl.'s Mot. at 27–29.  Defendants concede that these removal provisions are unconstitutional but argue that Plaintiff failed to exhaust this issue by neglecting to raise it before the agency.  *See* Defs.' Mot. at 1, 15; *Carr v. Saul*, 593 U.S. 83, 88 (2021) ("Administrative review schemes commonly require parties to give the agency an opportunity to address an issue before seeking judicial review of that question.").  Assuming without deciding that the issue was properly exhausted, this claim still fails because Plaintiff has not alleged any harm from the ALJ's removal protections.  *See Butler Amusements*, 2025 WL 2457687, at *9.

"A constitutional defect in the procedure for removing [an] officer—unlike a defect in his appointment—is 'no basis for concluding' that he 'lacked the authority to carry out the functions of the office.'"  *K & R Contractors, LLC v. Keene*, 86 F.4th 135, 149 (4th Cir. 2023) (quoting *Collins v. Yellen*, 594 U.S. 220, 258 (2021)); *see Collins*, 594 U.S. at 258 n.23.  "Rather, the actions of a lawfully appointed executive officer fulfilling the duties of his office are legitimate and enforceable, even if the President's authority to remove the officer was unconstitutionally limited during his tenure." *K & R Contractors*, 86 F.4th at 149.  It follows that "a party who has successfully challenged an unconstitutional removal restriction is not entitled to have the underlying agency action set aside absent reason to believe that the unconstitutional removal provision itself inflicted harm." *Id.; see NLRB v. Starbucks Corp.*, 125 F.4th 78, 88 (3d Cir. 2024); *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1137 (9th Cir. 2021).  "Distinct from a showing of

injury needed to establish standing, this harm requirement is an 'element that plaintiffs must show to make out their constitutional claim against . . . removal protections.'" *Butler Amusements*, 2025 WL 2457687, at *9 n.6 (quoting *Cortes v. NLRB*, No. 23-2954, 2024 WL 1555877, at *5 (D.D.C. Apr. 10, 2024)); *see Collins v. Dep't of Treasury*, 83 F.4th 970, 981 (5th Cir. 2023).

Plaintiff has not identified any harm flowing from the ALJ's removal protections. Nothing in the record suggests, for example, that the President attempted or desired to remove the ALJ, or that removal restrictions had any effect on the outcome of Plaintiff's proceedings. *See Collins*, 594 U.S. at 259–60. Therefore, regardless of the constitutionality of the ALJ's removal protections, "there is no reason to regard any of the actions taken" by the ALJ in this case "as void." *Id.* at 257–58.

**C.      DOL's Authority to Promulgate the 2008 Rules**

Plaintiff also contends that the award must be set aside because DOL lacked statutory authority to promulgate the 2008 H-2B regulations that governed the conduct at issue, and therefore lacked authority to enforce those regulations. *See* 5 U.S.C. § 706(2)(A), (C); Pl.'s Mot. at 33–36. The court disagrees.

The question of whether DOL possessed authority to promulgate regulations under the H-2B program has divided the Circuits. The Tenth and Eleventh Circuits have concluded that it does not. *See G.H. Daniels III & Assocs., Inc. v. Perez*, 626 F. App'x 205, 210–12 (10th Cir. 2015) (holding DOL lacked authority to promulgate 2008 regulation); *Bayou Lawn & Landscape Servs. v. Sec'y of Lab.*, 713 F.3d 1080, 1084–86 (11th Cir. 2013) (preliminarily enjoining 2012 regulation); *see also Perez v. Perez*, No. 3:14-cv-682, 2015 U.S. Dist. LEXIS 27606, at *11, 14 (N.D. Fla. Mar. 4, 2015) (following *Bayou Lawn* and prospectively enjoining 2008 regulation). The Third and Fourth Circuits, however, have held that DOL *does* have rulemaking authority to

administer the H-2B program. *See La. Forestry*, 745 F.3d at 669–75; *Outdoor Amusement Bus. Ass'n v. Dep't of Homeland Sec.*, 983 F.3d 671, 683–89 (4th Cir. 2020). This court finds the reasoning of the Third and Fourth Circuits more persuasive.[3]

As outlined above, an H-2B visa is statutorily available to a noncitizen (1) "having a residence in a foreign country which he has no intention of abandoning," who is (2) "coming temporarily to the United States to perform [nonagricultural] temporary service or labor," as long as (3) "unemployed persons capable of performing such service or labor cannot be found in this country." 8 U.S.C. § 1101(a)(15)(H)(ii)(b). Whether these criteria are satisfied in "any specific case or specific cases shall be determined by the [DHS], *after consultation with appropriate agencies* of the Government, upon petition of the importing employer." 8 U.S.C. § 1184(c)(1) (emphasis added). This "petition shall be in such form and contain such information as the [DHS] shall prescribe." *Id.*

Accordingly, although DHS is charged with deciding whether to grant or deny applications for H-2B visas, DHS requires an employer seeking to petition for an H-2B visa to first apply for and receive a temporary labor certification from the Secretary of Labor. 8 C.F.R. §§ 214.2(h)(6)(iii)(A), (C). The certification constitutes "advice" to DHS "on whether or not United States workers capable of performing the temporary services or labor are available and whether or not the alien's employment will adversely affect the wages and working conditions of similarly

---

[3] Defendants interpret Plaintiff's claim as a challenge to DOL's enforcement of the 2008 rules under *Perez*, responding that because the *Perez* injunction was prospective, it poses no bar to enforcement here. *See* Defs.' Mot. at 21–23. This is understandable; the ALJ and ARB similarly disposed of Plaintiff's challenge on *Perez* grounds, rather than engaging with the underlying statutory interpretation argument. But Plaintiff does not affirmatively argue that Defendants forfeited their statutory authority defense. Accordingly, that forfeiture argument is itself forfeited, and the court proceeds to the merits. *See Solomon v. Vilsack*, 763 F.3d 1, 13 (D.C. Cir. 2014).

employed United States workers."  *Id.* § 214.2(h)(6)(iii)(A).  "The DHS has also by regulation endowed the DOL with the authority to create the procedures necessary to fulfill its charge of issuing labor certifications . . . ."  *La. Forestry*, 745 F.3d at 660; *see* 8 C.F.R. § 214.2(h)(6)(iii)(D).

While the statute mandates that DHS consult with "appropriate agencies" in considering H-2B visa petitions, Congress left deliberately unspecified the identity of the consulting agency, the precise form that consultation must take, and the content of the visa petitions, affording DHS broad discretion to fill those gaps.  8 U.S.C. § 1184(c)(1); *see Outdoor Amusement*, 983 F.3d at 684–85.  This signals that Congress "explicitly endeavored to leave the [agency] substantial flexibility of choice in boldly and effectively accomplishing the herculean task of" operating a novel foreign-worker program, leaving it to DHS and its consulting agencies to "flesh out [its] contours."  *Cboe Glob. Mkts., Inc. v. SEC*, 155 F.4th 704, 713 (D.C. Cir. 2025) (cleaned up).  Congress has "often enacted" statutes that, like the INA, "empower an agency to prescribe rules to 'fill up the details' of a statutory scheme," *Loper Bright*, 603 U.S. at 395 (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825)), or employ a broad "term or phrase that 'leaves agencies with flexibility,'" *id.* (quoting *Michigan v. EPA*, 576 U.S. 743, 752 (2015)).  All that is required in such cases is that agencies engage in "'reasoned decisionmaking' within those boundaries."  *Id.* (quoting *Michigan*, 576 U.S. at 750).

DOL's exercise of rulemaking authority to administer the certification process fits comfortably within those bounds.  There is no question that, as the federal agency charged with protecting U.S. labor market conditions, DOL is the "appropriate" agency to administer the required consultation.  *See La. Forestry*, 745 F.3d at 674 ("[T]he DOL has institutional expertise in matters concerning U.S. employment, and a long and extensive history of issuing temporary labor certifications for non-agricultural jobs and making limited rules to structure the issuance of

such certifications."). DHS reasonably chose to consult DOL through a formalized labor certification process and to require that H-2B petitions "be accompanied by" such certifications from DOL. 8 C.F.R. § 214.2(h)(6)(iv)(A). Once DHS tasked DOL with carrying out that certification process, DOL had no choice but to formulate policy and make rules to fill the many details Congress left open. *See Morton v. Ruiz*, 415 U.S. 199, 231 (1974) ("The power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress."). "Without the ability to establish procedures to administer the temporary labor certification process, the DOL would not be able to fulfill the consulting role defined by DHS's charge to the DOL to issue temporary labor certifications." *La. Forestry*, 745 F.3d at 674.

Analogous provisions concerning foreign workers—for example those involving the H-2A program for agricultural workers—expressly grant DOL rulemaking authority over the labor certification process, confirming that Congress considered rulemaking a natural incident of DOL's consulting role. *See* 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), 1184(c)(1), 1188(a); *see also id.* §§ 1182(a)(5) (certain permanent labor certifications), 1182(n) (H-1B nonimmigrant workers). In *Bayou Lawn*, on which Plaintiff relies, the court invoked *expressio unius*, reasoning that because other, related provisions expressly specify a rulemaking role for DOL, Congress must have intended to withhold it for the H-2B program. *See* 713 F.3d at 1084 ("The absence of a delegation of rulemaking authority to DOL over the non-agricultural H-2B program in the presence of a specific delegation to it of rulemaking authority over the agricultural worker H-2A program persuades us that Congress knew what it was doing when it crafted these sections."). But *expressio unius* has weak probative force in this context. The better reading of this statutory scheme is that "the contrast between Congress's mandate in one context with its silence in another suggests not

a prohibition but simply a decision *not to mandate* any solution in the second context, i.e., to leave the question to agency discretion." *Cheney R. Co. v. ICC*, 902 F.2d 66, 69 (D.C. Cir. 1990).

As noted above, Congress requires DHS's "consultation with appropriate agencies" before granting either an H-2A or H-2B visa. 8 U.S.C. § 1184(c)(1). But for the H-2A program, Congress specified that "appropriate agencies" refers to DOL and the Department of Agriculture, *id.*, and that consultation should occur "by regulation," *id.* § 1188(a)(2). This asymmetry shows merely that Congress did not impose similar constraints in the H-2B program—it "implies discretion, not limitation." *Outdoor Amusement*, 983 F.3d at 687. "Surely Congress did not intend to give the consulting agency Homeland Security chooses for H-2B less power than Labor in its consulting role for H-2A when Congress used the same word in the same section but did not direct how that consultation can be done." *Id.*

Congress's explicit conferral of enforcement authority on DOL points in the same direction. Section 1184(c)(14) provides that DHS may delegate to DOL the authority to impose administrative remedies for substantial failures to meet the conditions of an H-2B petition or willful misrepresentations of material fact in such petitions. *See* 8 U.S.C. § 1184(c)(14)(A)–(B). That Congress expressly contemplated DOL's exercise of enforcement authority over the very program conditions the 2008 regulations govern is strong evidence that Congress anticipated DOL would need to promulgate rules to administer those conditions.

Statutory history confirms this reading. Congress originally vested final authority to issue H-2 visas in the Attorney General, requiring the same "consultation with appropriate agencies of the Government" as it does of DHS today. 8 U.S.C. § 1184(a)(1), (c)(1). Just as DHS has, the Attorney General consistently chose to consult with DOL through the labor certification process, *see* 18 Fed. Reg. 4925 (1953); 31 Fed. Reg. 4446, 6611 (1966); 38 Fed. Reg. 35,427 (1973), and

DOL issued regulations to define and govern that process for non-agricultural workers, *see, e.g.*, 33 Fed. Reg. 7570 (1968); *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 595–96 (1982) (recognizing DOL's responsibility for "initial determinations" as to whether entry of foreign workers meets statutory requirements).  When Congress divided the H-2 program into separate agricultural and non-agricultural components in 1986, it left the consultation language for the H-2B program unchanged, *see* 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a)–(b), 1184(c)(1), and DOL continued to serve as the designated consulting agency exercising rulemaking authority through the certification process, *see, e.g.*, 55 Fed. Reg. 50,510 (1990).  Congress has since amended the INA on multiple occasions without imposing any restrictions on DOL's involvement in the H-2B program.  *See La. Forestry*, 745 F.3d at 674.

"It is well established that when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.'"  *CFTC v. Schor*, 478 U.S. 833, 846 (1986) (quoting *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 275 (1974)); *see Monsalvo Velazquez v. Bondi*, 604 U.S. 712, 725 (2025).  The statutory history of the H-2 program confirms that Congress "incorporated and ratified the [agencies'] longstanding regulatory" understanding of DOL's consulting authority.  *Jazz Pharms., Inc. v. Kennedy*, 141 F.4th 254, 262 (D.C. Cir. 2025).

The court accordingly holds that DOL's 2008 regulations were validly promulgated pursuant to implicit congressional authorization and that the ARB's enforcement of them was not contrary to law.

D.      **Statutory Challenges to Back-wages Award**

Plaintiff also argues that DOL lacked statutory authority to impose back wages.  *See* Pl.'s Mot. at 36–39.  But Plaintiff's interpretation of the statute is without any support.  As explained above, Congress authorized DOL to "impose such administrative remedies (including civil monetary penalties in an amount not to exceed $10,000 per violation) as the [agency] determines to be appropriate" upon finding a substantial failure to meet program conditions or a willful misrepresentation.  8 U.S.C. § 1184(c)(14)(A)(i); *see id.* § 1184(c)(14)(B).    Plaintiff reads the parenthetical listing of civil monetary penalties as an exhaustive enumeration of the remedies available to the Secretary.  *See* Pl.'s Mot. at 36–37.  But Congress wrote "includes," not "includes only" or "is limited to"; it is clear that "civil monetary penalties" are but one example of possible remedies under the statute.  *See* Defs.' Mot. at 23–24; *Include*, Black's Law Dictionary (11th ed. 2019) ("The participle *including* typically indicates a partial list.").  Contrary to Plaintiff's interpretation, the statute grants the agency wide remedial discretion, authorizing, "in addition to *any* other remedy authorized by law, . . . such administrative remedies . . . as the Secretary determines to be appropriate." 8 U.S.C. § 1184(c)(14)(A)(i) (emphasis added).  "'[R]ead naturally, the word "any" has an expansive meaning, that is, "one or some indiscriminately of whatever kind."'"  *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)).  The term "appropriate" similarly vests the agency with broad remedial discretion.  *See Michigan*, 576 U.S. at 752.  The court therefore concludes that nothing in the statute indicates Congress's intent to prevent the agency from awarding back wages.

Contrary to Plaintiff's representations, there was also nothing arbitrary and capricious about the agency's award of back wages to affected H-2B workers.  As to the deductions for uniform cleaning, H-2B regulations require that "the job offer . . . specify all deductions not

required by law that the employer will make from the worker's paycheck." 20 C.F.R. § 655.22(g)(1). Plaintiff violated this requirement by disclosing a uniform deduction of $13.66 per pay period in the job offer, but in fact deducting $18.62. AR 6666. That Plaintiff informed workers of the higher amount upon their arrival—after they had traveled internationally to take the position—does not cure the violation. By expressly requiring that "the job offer" include "all deductions . . . that the employer will make from the worker's paycheck," the regulation makes clear that the employer must make accurate *pre-hiring* disclosures to prospective workers. 20 C.F.R. § 655.22(g)(1); *see* AR 6675.

As to the allegedly improper deductions for housing, the H-2B regulations require compliance with the Fair Labor Standards Act (FLSA), 20 C.F.R. § 655.22(g)(1), which prohibits charging employees for lodging "furnished in violation of any Federal, State, or local law, ordinance or prohibition," 29 C.F.R. § 531.31. Plaintiff does not dispute that the Butterworth Court unit was in a zone that prohibited residential use without a conditional use permit, and that it did not possess such a permit. Thus, the ALJ found, and the ARB correctly affirmed, that the housing Plaintiff provided to some of its H-2B workers could not be used as residential living quarters under local ordinances, and that Plaintiff violated 20 C.F.R. § 655.22(g)(1) by deducting rent for such housing. AR 6465, 6676.

Plaintiff's claim that the back wages amount resulted in an unwarranted "windfall" also fails. Pl.'s Mot. at 33. As noted above, the difference between the disclosed and actual uniform deduction was $4.96 per pay period. AR 6464. According to Plaintiff's own investigator, the overage impacted 21 workers, amounting to $99.20 per worker across the three years, for a total award of $2,083. *Id.* Thus, the total award of $2,083 merely reimburses workers for the precise amounts Plaintiff improperly deducted from their paychecks. *See* AR 6677. As to the housing

deduction, rent at the Butterworth Court unit was $200 in 2013 and 2014 and $300 in 2015.  AR

6465.  Five employees lived at the unit in 2013 and six employees lived there in 2014 and 2015,

for a total of $36,000 collected in rent across the three years.  AR 6466.  The agency determined

that "because this matter involves an improper deduction in violation of applicable housing and

zoning codes," wholesale reimbursement of rent was the "appropriate remedy."  AR 6677 n.75.

The court finds no "clear error of judgment" in this determination.  *Marsh v. Or. Nat. Res. Council*,

490 U.S. 360, 378 (1989) (cleaned up).  The job order expressly promised employer-provided

housing meeting applicable codes, and H-2B workers foreseeably relied on this promise in

accepting employment on those terms.  *See* 20 C.F.R. §§ 655.18(b)(10)–(11), 655.22(g)(1).

Because Plaintiff collected rent for housing that failed to satisfy conditions that it represented

would be met, full reimbursement was not unreasonable.

### E.    Eighth Amendment Prohibition on Excessive Fines

Finally, Plaintiff argues that the $43,500 imposed for the housing-related violation

($36,000 in back wages and $7,500 in civil penalties) constitutes an excessive fine in violation of

the Eighth Amendment.  *See* Pl.'s Mot. at 30–33.  The Eighth Amendment provides that

"[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual

punishments inflicted."  U.S. Const. amend. VIII.

Assuming the Excessive Fines Clause applies to the award in this case, there is no

constitutional violation.  "The Excessive Fines Clause limits the government's power to extract

payments, . . . 'as *punishment* for some offense.'"  *Austin v. United States*, 509 U.S. 602, 609–10

(1993) (quoting *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265

(1989)).  As explained above, the $36,000 in back wages is not punitive, but compensatory: it

merely reimburses affected workers for the amounts Plaintiff improperly deducted from their pay

for unlawful housing over three years.  As to the $7,500 civil penalty, the Excessive Fines Clause prohibits fines that are "grossly disproportional to the gravity of a defendant's offense."  *United States v. Bajakajian*, 524 U.S. 321, 334 (1998); *cf. Collins v. SEC*, 736 F.3d 521, 526 (D.C. Cir. 2013) (considering "(1) the essence of the crime and its relation to other criminal activity; (2) whether the defendant fit into the class of persons for whom the statute was principally designed; (3) the maximum sentence and fine that could have been imposed; and (4) the nature of the harm caused by the defendant's conduct").  The housing violation, while not necessarily resulting in unsafe or substandard conditions, harmed the affected workers' reliance interests as well as the integrity of the H-2B program.  Plaintiff charged workers for housing that violated local law in breach of its employment contract, which expressly promised housing that met applicable codes.  As Plaintiff acknowledges, the $7,500 in civil penalties—representing just $2,500 per year of violation—was well below the $10,000 statutory maximum per violation, in recognition of Plaintiff's lack of prior violations and good-faith compliance efforts.  *See* Pl.'s Mot. at 32, AR 6667.  There is nothing "grossly disproportional" about this penalty.  *See Collins*, 736 F.3d at 526.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment, ECF No. 16, will be DENIED, and Defendants' cross-motion for summary judgment, ECF No. 19, will be GRANTED.  An order consistent with this Memorandum Opinion will be entered separately.

Date: March 25, 2026

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge